**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Christian SCHMIDGALL,**
**Defendant–Appellant.**

**No. 91–4161.**

United States Court of Appeals,
Eleventh Circuit.

July 14, 1994.

---

Philip M. Gerson, Miami, FL, for appellant.

Gary Montilla, Tampa, FL, for appellee.

Before KRAVITCH, ANDERSON and EDMONDSON, Circuit Judges.

ANDERSON, Circuit Judge:

Defendant–Appellant Christian Schmidgall was indicted in the Middle District of Florida for conspiring to violate federal law by unlawfully importing cocaine through Rock Sound, Bahamas on Christmas Eve, 1985 in violation of various provisions of Title 21 of the United States Code. He moved to dismiss the indictment, claiming an improper use of his immunized testimony in violation of his Fifth Amendment right against self-incrimination. *See Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). After a three-day hearing before a magistrate, Schmidgall's motion was denied. He then entered a conditional plea of guilty to two counts pursuant to Fed.R.Crim.P. 11(a)(2). Schmidgall was sentenced to two six-year terms, to run concurrently.

Schmidgall now appeals his conviction and his sentence. He argues that the district court erred in determining that his indictment was obtained without any use of his immunized testimony. In addition, he argues that the district court erred in considering the availability of parole when imposing his sentence. We will address these issues in turn.

### FIFTH AMENDMENT *KASTIGAR* CLAIM

#### I. Factual Background

Law enforcement authorities throughout the Southeast United States conducted a widespread investigation into drug importation activities coordinated by William Wood.[1] The investigation of Wood's activities in the Middle District of Florida was dubbed "Operation Timber" and initially was spearheaded by Customs Special Agents Donald Schmidt and Daniel Dunn. The investigation began in January 1987, after a small jet of Wood's was seized and became the subject of a civil forfeiture proceeding. After the forfeiture was concluded, Agents Schmidt and Dunn worked together in Operation Timber until the spring of 1988, when Dunn was promoted to a supervisory position and Schmidt became the sole case agent.

One of Wood's co-conspirators was Defendant–Appellant Christian Schmidgall, a former commercial airline captain whose specialty was "running radios": monitoring law-enforcement frequencies and maintaining contact with pilots flying illegal drugs into the country. As early as April 1987, investigators had evidence linking Schmidgall with Wood, in the form of reports indicating that Schmidgall, Wood, and others had flown from the Bahamas into the United States in late 1985. On November 11, 1987, Agent Schmidt and others interviewed David Carlson, another player in the Wood conspiracy. He identified Schmidgall (by first name only) as a participant in a venture that smuggled

---

1. The account of the investigation is drawn from the transcripts of the *Kastigar* hearing before U.S. Magistrate Charles Wilson in Tampa, Florida on February 5, 6, and 13, 1991.

cocaine into Alabama in December of 1985;[2] however, Carlson gave no information regarding the transaction involved in this case.

Eight days later, on November 19, 1987, Schmidt, Dunn, and others interviewed William Wood, who was incarcerated in federal prison in Ashland, Kentucky. In this interview, Wood identified Schmidgall as a "radio runner" in general and gave a few details about the Alabama importation. Subsequent to this interview with Wood, Schmidt compiled additional evidence regarding Schmidgall, including more reports of flights entering the country from the Bahamas. These reports indicated that Schmidgall had flown with a person named Jeffrey Hutchinson. Other investigation included interviews with Wood associates who confirmed Schmidgall's role in the Alabama importation; none of these persons gave information regarding the cocaine importation through Rock Sound, Bahamas on Christmas Eve, 1985, the transaction that is the basis of Schmidgall's conviction in this case.

Wood was interviewed for a second time on January 12, 1988 in the Sarasota (Florida) County Jail. Wood was brought to Florida pursuant to a pending agreement in which Wood would become a government witness, providing detailed information about the importation of thousands of kilograms of illegal drugs. In the January interview, Wood provided a few details of the Rock Sound venture, including the involvement of Schmidgall, the amount of cocaine involved, and the fact that various problems beset the venture resulting in only partial success.

On January 21, 1988, Agents Dunn and Schmidt—accompanied by Ronald Ingleby and C.C. Savage, also Customs agents—visited Schmidgall's home in Lighthouse Point, Florida. The purpose of the visit was to convince Schmidgall to cooperate in the government's investigation. No substantive information was obtained at this time, and Schmidgall makes no Fifth Amendment claim regarding this transaction.

Before January 26, 1988, the government had general knowledge of the Rock Sound venture and Schmidgall's involvement, but lacked specific details. Schmidgall submitted to an interview on January 26, 1988 in the office of William Shockley, Assistant United States Attorney for the Southern District of Florida. Also present were Customs Agent Ingleby, Internal Revenue Service Agent Rodney Clark, and United States Coast Guard Lt. David Hume. Neither Schmidt nor Dunn participated in this interview. The government has stipulated that Schmidgall was granted "use" and "derivative use" immunity, but not "transactional" immunity. In other words, the government agreed that nothing Schmidgall said could be used in any manner that would incriminate Schmidgall; however, he was not guaranteed that he would not be prosecuted for his participation in the smuggling conspiracy. During this interview, Schmidgall recounted details of the Rock Sound venture that previously had not been disclosed to the government.

Agent Schmidt was in the Miami area during the first week of February 1988. During that trip, Schmidt visited Agent Ingleby's office. Ingleby gave Schmidt a copy of the handwritten notes IRS Agent Clark had made during the immunized January 26 Schmidgall interview.[3] At the time, Schmidt had no idea that the information in the notes was protected by immunity. He testified that he "briefly perused" the notes and then filed them away. Schmidt also testified that he never again read the notes, because sometime in the early summer of 1988 it was decided that the Rock Sound importation would be prosecuted in the Southern District of Florida.

Before that decision was made, however, Schmidt participated in an extensive debriefing of William Wood. Wood had reached a tentative plea agreement, following which he was debriefed in great detail for about 60 hours from April 22–29, 1988. Schmidt was the primary questioner. From this series of

---

2. The Alabama importation is the subject of another *Kastigar* appeal by Schmidgall. *See United States v. Schmidgall*, 25 F.3d 1533 (11th Cir. 1994), issued simultaneously with the instant case.

3. It is not entirely clear that Clark is the person who made the notes; however, the identity of the note-taker is not germane to the resolution of this case.

interviews, Schmidt produced a 31–page report summarizing Wood's account of many different smuggling ventures. Wood described the Rock Sound project in greater detail than he had in his January 12 statement; included were facts similar to information revealed by Schmidgall in his immunized January, 1988 interview in the office of the U.S. Attorney for the Southern District of Florida, which information was also included in the interview notes given to Schmidt.

Following the detailed Wood interviews, Schmidt continued to investigate the smuggling ring, including the Rock Sound venture.[4] In May 1988, he requested and received more detailed accounts of flights between the Bahamas and Florida made by Wood, Schmidgall, and others. In September of that year, Schmidt received a report indicating that an aircraft associated with Schmidgall had been abandoned at an airfield in Rock Sound on Christmas Eve, 1985. From July 26 through September 6, 1988, Schmidt had a series of interviews with William Davis, the pilot of the plane that flew the cocaine from Columbia to Rock Sound. Davis recounted details including Schmidgall's participation in the venture.

Schmidt also had ongoing contact with investigators from other districts who were working on the Wood conspiracy. Agent Ingleby, who had been present at the January 1988 Schmidgall interview, continued to exchange information with Schmidt; Ingleby had conducted extensive debriefings of Wood after Schmidt's April 1988 Wood interviews. Ingleby placed his summary of the Wood debriefings in a Customs database, where it was later retrieved by Daniel Dunn, Schmidt's former colleague and current supervisor. Dunn discussed the case with Schmidt after reading Ingleby's report, but testified that he made a "concerted effort" not to discuss the report with Schmidt because Dunn was aware of potential *Kastigar* problems. Finally, Schmidt discussed the Wood conspiracy with investigators from Alabama, who had conducted a second immunized interview of Schmidgall on December 5, 1988. Schmidgall gave no new information on Rock Sound in this second interview.

By sometime in the fall of 1989, authorities in the Southern District of Florida had decided to prosecute importations made by the Wood conspiracy dating back only to January of 1986; because the Rock Sound venture was before this date, prosecution of the Rock Sound matter was taken over by Schmidt and others in the Middle District. Schmidt testified that he did not read the notes of the January 1988 Schmidgall interview after he resumed active investigation of the Rock Sound venture. Schmidt interviewed Jeffrey Hutchinson on December 29, 1989; Hutchinson, who previously had been identified as an associate of Schmidgall, gave further details of Schmidgall's participation in the Rock Sound smuggling.

On February 9, 1990, Schmidt testified before a grand jury regarding Schmidgall's role in the smuggling conspiracy. Schmidt testified again before the same grand jury on June 1, 1990; however, very little new information was elicited. Schmidt was the only witness to give evidence regarding Schmidgall's participation in the Rock Sound venture. Subsequently the grand jury returned an indictment against Schmidgall for his role in the Rock Sound smuggling.

## II. The *Kastigar* Hearing

Pursuant to Schmidgall's challenge of his indictment on Fifth Amendment self-incrimination grounds, a hearing was held before a magistrate judge on February 5, 6, and 13, 1991. Testimony was heard from several witnesses, the most crucial being Agent Schmidt. Upon direct examination, the government had Schmidt explain the source of each piece of information from his grand jury testimony regarding Schmidgall. For each fact, Schmidt testified that the source was wholly independent from any immunized statement of Schmidgall. However, Schmidt

---

4. Between the early summer of 1988 (when most of the prosecution was shifted to the Southern District of Florida) and the fall of 1989 (when the decision was made to prosecute the Rock Sound venture in the Middle District), the Middle District of Florida prosecutors anticipated prosecuting only William Davis and Thomas Barko, other Wood conspirators, in the Middle District of Florida.

did admit that he received and "briefly perused" notes of the January 1988 immunized Schmidgall interview; that he was unaware of any potential self-incrimination issues; and that a majority of the information he presented to the grand jury was learned *after* early February 1988, when he received the notes of the Schmidgall interview.

On cross examination, Schmidgall's attorney also focused on the facts Schmidt presented to the grand jury. In contrast to the government's approach, he pointed out that many of the facts presented by Schmidt were first divulged to the government in Schmidgall's January 1988 statement.

After the hearing, the magistrate judge issued a report and recommendation finding that the government had met its burden of proving that each piece of information presented to the grand jury was derived from a source wholly independent from Schmidgall's immunized statements, and that the information was in no way tainted by the derivative use of immunized testimony. The district court adopted the report and recommendation, and denied Schmidgall's motion to dismiss the indictment. This appeal followed.

III. The Law and its Application to the Facts

A. *Kastigar* and Self–Incrimination Law

■ When the government seeks to prosecute a witness who previously has given self-incriminating testimony pursuant to a grant of immunity, serious Fifth Amendment questions are raised. In *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that such a prosecution was allowable, but the prosecution is prohibited from "using the compelled testimony in *any* respect" that would "lead to the infliction of criminal penalties on the witness." *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661 (emphasis in original). The Court rejected the position that once compelled immunized testimony was given, the witness must be granted full transactional immunity. Therefore, when presented

with a *Kastigar* challenge, a court's task is to determine whether any of the evidence used against the defendant was in any way derived from his compelled immunized testimony.[5] Once a defendant shows that he has testified under immunity, the prosecution has the burden of showing that its evidence is not tainted; this is done by establishing the existence of an independent, legitimate source for the disputed evidence. *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1665.

■ To establish a "wholly independent" source, the government must demonstrate that each step of the investigative chain through which the evidence was obtained is untainted. *United States v. Hampton*, 775 F.2d 1479, 1489 (11th Cir.1985). This includes an affirmative showing that none of the evidence presented to the grand jury was derived directly or indirectly from the immunized testimony. *Id.* at 1486. The protection against self-incrimination is violated whenever the prosecution presents a witness whose testimony is shaped—directly or indirectly—by immunized testimony, regardless of how or by whom the witness was exposed to that testimony. *United States v. North*, 920 F.2d 940, 942 (D.C.Cir.1990), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). Prohibited indirect derivation includes using immunized testimony to help shape the questioning of another witness. *See Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1664–65 (use of compelled testimony as an investigatory lead or in focusing the investigation on a witness is barred). A government agent's denials that he made use of the immunized testimony, standing alone, are generally insufficient to meet the government's burden, even if made in good faith. *Hampton*, 775 F.2d at 1485.

■ Although the government's task has been characterized as a "heavy burden," it is clear that the government is required to prove an absence of taint only by a preponderance of the evidence. *United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir.1985).

---

5. Schmidgall's testimony was not compelled or granted pursuant to 18 U.S.C. § 6002, the statute involved in *Kastigar*. However, the Fifth Amendment standard applies to informal grants of immunity such as the one at issue in this case. *See United States v. Harvey*, 869 F.2d 1439, 1450–51 (11th Cir.1989); *Rowe v. Griffin*, 676 F.2d 524, 527 (11th Cir.1982).

Negation of all abstract possibility of taint is not necessary. *Id.* Further, this Circuit has adopted the "evidentiary" interpretation of *Kastigar:* that the focus of a challenge on self-incrimination grounds should be on the direct and indirect evidentiary uses of immunized testimony, rather on non-evidentiary matters such as the exercise of prosecutorial discretion. *Byrd,* 765 F.2d at 1529–31 (disagreeing with *United States v. Semkiw,* 712 F.2d 891 (3d Cir.1983), and *United States v. McDaniel,* 482 F.2d 305 (8th Cir.1973)). Finally, even if immunized testimony was in fact used, an indictment or conviction may be upheld on a finding that the use of such tainted evidence was harmless beyond a reasonable doubt. *United States v. Byrd,* 765 F.2d 1524, 1529 n. 8 (11th Cir.1985).

### B. Application of Law to Facts

██ *1. Notes of the Schmidgall interview.*—Schmidgall's most forceful claim is that the government has failed to prove that Schmidt did not use the notes of the Schmidgall interview supplied by Ingleby to shape the questioning of other witnesses, whose testimony in turn was used by Schmidt in front of the grand jury. The *Kastigar* hearing included a line-by-line, item-by-item examination of Schmidt's grand jury testimony. However, in this examination, Schmidt only pointed to his interviews with witnesses other than Schmidgall; he did not show that the questioning of these witnesses was not influenced by the notes of the Schmidgall interview.

Schmidt did testify that' he merely "perused" the notes upon receiving them in February 1988, garnering no substantive information from them, and thereafter never retrieved the notes from his files. The magistrate judge accepted this testimony, noting that it was corroborated by the fact that "at that time" (presumably February 1988, when Schmidt received the notes), Schmidt "was not aware that the Rock Sound incident

would be prosecuted in the Middle District of Florida." Magis. R & R at 11.

However, the testimony at the *Kastigar* hearing casts doubt upon this findin' Schmidt did testify that he did not re~.ew the notes *after* his initial perusal because it had been agreed earlier that the smuggling ventures overseen by Fabio Ochoa, of which Rock Sound was one, would be charged in the Southern District of Florida. On cross-examination, however, Schmidt stated that it was *after* the Wood interviews of April 1988 that it was decided to assign responsibility to the Southern District of Florida. Schmidt stated: "It was after the Wood debriefings. It was probably in May or even after May of '88; early summer, I'm pretty sure it was." *Kastigar* Hearing, Feb. 13, 1991, at 13. There have been no findings of fact in the district court as to the precise time a decision was made to turn over to the Southern District of Florida the relevant prosecution.[6] If the decision to prosecute the matter in the Southern District was not made until May or June of 1988, then this fact cannot corroborate Schmidt's testimony that he had no interest in the Rock Sound episode or in Schmidgall as of the time he conducted the Wood interviews in April 1988. Moreover, our review of the current record reveals no other corroboration.

The government must demonstrate that its questioning of Wood during the April 1988 interviews was not derived from immunized testimony, and the uncorroborated testimony of Schmidt would not generally be sufficient to carry the burden. Thus, the government must point to some other evidence to corroborate Schmidt's position that he did not utilize the notes of the immunized Schmidgall testimony in his April 1988 questioning of Wood. It is clear, of course, that Schmidt did have access to those notes at that time. Moreover, in the April 1988 interviews Wood apparently did testify concerning matters that had been first revealed to the government during the previous immunized Schmidgall interview.[7] Based on the record as it

---

6. We decline to read into the magistrate judge's opinion an implied finding that such decision had been made by February 1988 in light of the very specific testimony of Schmidt on cross-ex-

amination that it was after the April 1988 interviews of Wood.

7. At the *Kastigar* hearing, the government did not attempt to demonstrate that its questions to

currently stands, we are unable to sustain the finding that the government met its burden of proving that Schmidt did not use the notes of the immunized Schmidgall interview to shape his questioning of Wood in April 1988.

■ The record does provide partial corroboration for Schmidt's testimony. During the period of time that Schmidt thought the Rock Sound matter would be prosecuted in the Southern District of Florida—*i.e.*, from May or June of 1988 until the fall of 1989, when prosecution was turned back over to the Middle District of Florida—it does make sense that Schmidt's interest in Rock Sound and Schmidgall would be diminished. However, we find no evidence corroborating Schmidt's diminished interest either before that time or after.[8]

2. *Continued contact with other agents.*— Schmidgall's second allegation of taint involves Schmidt's continuing contact with other investigators who were directly or indirectly exposed to immunized testimony. He claims that these investigators may have discussed with Schmidt matters they first learned from protected testimony, and that Schmidt later used this information to shape his further investigation. Therefore, Schmidgall claims, Schmidt's "fund of information" was tainted, leading to the derivative use of immunized testimony.

The magistrate judge found that Schmidt testified convincingly that he relied upon wholly independent sources during his investigation, and that there was no evidence to support Schmidgall's contention of taint. As we have explained, Schmidt was able to identify sources other than immunized statements for his grand jury evidence at the *Kastigar* hearing. However, the government made no showing that the questioning of these other sources was in no way influenced

by immunized testimony. The burden of proof remains with the government; the defendant is not required to present evidence that the grand jury testimony was in fact tainted. As with the allegation regarding the Schmidgall notes, the record is insufficient to support a finding of absence of taint.

■ For the foregoing reasons, we conclude that the judgment of the district court must be vacated and the case remanded for further proceedings. As we have observed, in general a government agent's bare denials that he used the immunized testimony are insufficient to meet the government's burden. *United States v. Hampton*, 775 F.2d 1479, 1485 (11th Cir.1985). Considering the explanatory nature of Agent Schmidt's testimony, this case is not a "bare denial" case, however. And, the government is not required to negate every possibility of taint. *United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir.1985). The government's burden of proof is by a preponderance of the evidence. *Id.* Nothing in this opinion is intended to imply that the government must produce more than a government agent; for example, an agent's testimony can be sufficient when it is adequately supported by (that is, consistent with) the facts and circumstances of the particular case. But in the case before us, some confusion in the record concerns us, especially confusion arising from the inconsistent evidence about the period in which the Southern District was responsible for prosecuting the Rock Sound matter, thus leaving little evidence in the present record to establish for that period of time anything more than Agent Schmidt's mere denial.

### C. Further Proceedings

Due to our holding that the government has not carried its burden of proving that Schmidt did not use the notes of the January

---

Wood in April 1988 were not derived from the prior immunized testimony. The record on appeal contains only summaries of the interviews with Wood and thus does not reveal the precise questions that were asked.

8. Schmidgall also claims that the government impermissibly used the immunized testimony to corroborate Wood's information—that is, to assure itself that Wood was telling the truth. It is alleged that this type of mere corroboration vio-

lates *Kastigar*. *See United States v. Carpenter*, 611 F.Supp. 768, 779–80 (N.D.Ga.1985). We do not agree. *Carpenter* apparently adopted the type of "non-evidentiary" interpretation of *Kastigar* that subsequently was disapproved by this court in *United States v. Byrd*, 765 F.2d at 1529–31. This argument of Schmidgall fails because it does not focus on the source of the evidence actually used to obtain the indictment.

Schmidgall interview to shape his questioning of Wood or other witnesses, nor of proving that Schmidt did not obtain and use tainted information from other agents, we are unable to sustain the finding that Schmidt's grand jury testimony was not tainted within the meaning of *Kastigar.* We therefore vacate and remand this case. *See United States v. Harvey,* 869 F.2d 1439, 1445 (11th Cir.1989); *United States v. North,* 910 F.2d 843, 872–73 (D.C.Cir.1990); *cf. United States v. Hampton,* 775 F.2d 1479, 1491 n. 54 (11th Cir.1985) (declining to remand after reversing the district court's finding of no taint, "[g]iven the peculiar circumstances of this case"). On remand, if the prosecution is to continue, the district court must inquire whether Schmidt's questioning of witnesses was in any way shaped by his exposure—through the Clark notes or contacts with other agents—to Schmidgall's immunized statement of January 26, 1988.[9] If the government is unable to disprove taint by a preponderance of the evidence, the court must then determine if any tainted evidence was actually used by Schmidt during his grand jury testimony. *See United States v. Byrd,* 765 F.2d 1524, 1530–31 (11th Cir.1985). Finally, if tainted evidence was presented to the grand jury, the district court must consider whether its use was harmless beyond a reasonable doubt.[10] *Id.* at 1529 n. 8.

Schmidgall alleges that agents seeking to avoid a *Kastigar* violation must either rely solely upon information obtained before the immunized statement was given or adopt procedures to ensure that there is not any use of the immunized statement or evidence derived therefrom. Because Agent Schmidt did neither, Schmidgall claims that the inevitable result was a *Kastigar* violation. If this argument is accepted, a remand clearly would be futile.

In support of this contention, Schmidgall cites this court's opinion in *United States v. Hampton.* *Hampton* does state that when the government uses information that was gathered after an immunized statement was given, the government as a practical matter usually must show that "prosecuting officials and their agents were aware of the immunity problem and followed reliable procedures for segregating the immunized testimony and its fruits" from prosecuting officials. *Hampton,* 775 F.2d at 1490. Because the relevant authorities in this case were not aware of a potential *Kastigar* problem until sometime in 1990, Schmidgall claims that the resulting failure to insulate the immunized testimony presents a *per se* case of taint.

We do not interpret *Hampton* as laying down such an inflexible rule. That case involved widespread circulation of immunized testimony over a long period of time; the court noted that it was practically impossible for the government to trace each piece of information to an independent source. *Hampton,* 775 F.2d at 1490. Faced with a situation such as that in *Hampton,* the government is forced to rely either on information obtained before the immunized statement or on a reliable insulating procedure. Here, however, we have a much closer case. The amount of information contained in the immunized statement and its circulation were

---

9. Of course, the government must prove a lack of taint from the second Schmidgall statement of December 5, 1988 as to any evidence gathered after that date and used by Schmidt during grand jury proceedings.

10. Judge Kravitch suggests that this case should be remanded only for the limited purpose of a harmless error analysis because the government has been given every opportunity to disprove taint. Of all the *Kastigar* cases in courts of appeals, only a handful are outright reversals with directions to dismiss the indictment or reverse the conviction without allowing further proceedings. *See, e.g., United States v. Hampton,* 775 F.2d 1479 (11th Cir.1985); *United States v. Poindexter,* 951 F.2d 369 (D.C.Cir.1991); *United States v. Palumbo,* 897 F.2d 245 (7th Cir.1990).

In every case ordering outright reversal, the opinion indicated that there was a clear use of immunized testimony and that further proceedings would be futile. This type of circumstance does not apply in the instant case. The question of whether the government carried its burden of showing lack of taint is close, *e.g.* hinging upon inconsistent evidence about the period of time for which the Southern District was responsible for prosecuting the Rock Sound matter. As we note in the body of the opinion, there are several viable issues that the district court must address: the existence of taint, whether such tainted evidence was used by Schmidt before the grand jury, and whether any such use was harmless. Obviously, if the government does not think that the required proof can be made, the proceedings will be dropped.

▐▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

not so widespread as to make the government's burden of tracing "virtually insurmountable," *Hampton,* 775 F.2d at 1490. Indeed, Schmidgall's counsel admitted at oral argument that it was possible the evidence used before the grand jury was untainted (although he strenuously argued that the government had failed to prove this). We therefore find that *Hampton*—from which this case is distinguishable—did not establish a *per se* rule of taint.

## CONSIDERATION OF PAROLE DURING SENTENCING

▇▇▇ Schmidgall was sentenced to concurrent six-year terms on the two counts to which he pleaded guilty. This sentence was, on its face, longer than that imposed upon co-conspirators. However, the court noted that the co-conspirators were sentenced under the United States Sentencing Guidelines and would serve the full terms of their sentences (with a small allowance for good behavior), whereas Schmidgall was sentenced under pre-Guidelines law and would be eligible for parole. Taking this difference into account, the court termed any apparent disparity in sentencing "illusory." Schmidgall claims that the court made a "groundless inference" that Schmidgall would be paroled, necessitating resentencing.

▇▇▇ We find Schmidgall's claim without merit. The six-year sentence is well below the applicable statutory maximum of twenty years. *See* 21 U.S.C. §§ 841, 960 (as in effect at the time of the offense). A sentence within the statutory limits will not be questioned on appeal absent a "showing of arbitrary or capricious action amounting to a gross abuse of discretion." *United States v. Giltner,* 972 F.2d 1563, 1564 (11th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 2383, 124 L.Ed.2d 286 (1993). A defendant may not be sentenced based on groundless inferences. *United States v. Lopez,* 898 F.2d 1505, 1512 (11th Cir.1990).

Schmidgall claims that the "groundless inference" in the present case is that he will in fact be paroled. A review of the transcript of the sentencing hearing reveals that the district court based its decision on the undisputed fact that the sentence will be parolable,

along with the assumption that parole may in fact be granted. This is not the type of groundless inference that a sentencing court is prohibited from making. The Seventh Circuit has held that a sentencing court may consider the availability of parole. *United States v. Plain,* 856 F.2d 913, 918 (7th Cir. 1988); *United States v. Neyens,* 831 F.2d 156, 162 (7th Cir.1987). Schmidgall proposes no compelling reason for differing from the Seventh Circuit's holdings. We find that the sentencing court did not abuse its discretion.

## CONCLUSION

On the record before us, we are unable to agree that the United States met its burden of proving by a preponderance of the evidence that none of Schmidgall's immunized testimony was used in obtaining the indictment against him. We therefore vacate the district court's holding and remand for further proceedings consistent with this opinion. Provided the government carries its burden, we find no error in the imposition of the sentence.

## VACATED AND REMANDED.

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

I agree that the government failed to disprove taint as required by *Kastigar,* and I join the court's opinion to that extent. I disagree, however, with the majority's disposition of the case, remanding to the district court for a further evidentiary hearing. Another *Kastigar* hearing serves only to afford the government a second opportunity to carry a burden it did not bear the first time around.

The cases cited by the majority do not, in my view, lend support for an additional hearing in this case. In *United States v. Harvey,* 869 F.2d 1439 (11th Cir.1989) (en banc), we remanded for a hearing because "the record reveal[ed] that the magistrate did not permit the government to show the independent sources of its evidence against Harvey.... [The district court's dismissal of the indictment] was premature without giving the government the opportunity to meet its burden under *Kastigar.*" *Id.* at 1445. Similarly, in

*United States v. North,* 910 F.2d 843 (D.C.Cir.1990), the court remanded for a hearing because of its "great[ ] concern [over] the District Court's decision not to hold a full-blown, item-by-item *Kastigar* hearing." *Id.* at 872.

Here, by contrast, the magistrate judge held a full and fair, three-day *Kastigar* hearing at which the government was given every opportunity to present evidence that Agent Schmidt's grand jury testimony was wholly uninfluenced by Schmidgall's immunized statement. The government concedes that at this hearing "Agent Schmidt testified as to the source of every fact that had been presented to the grand jury regarding the defendant." Brief of Appellee at 3. The government also presented documentary evidence and the testimony of Agent Dunn and witnesses Wood and Hutchinson. In my opinion, therefore, this case is akin to *United States v. Hampton,* 775 F.2d 1479 (11th Cir. 1985), in which we declined to order a further *Kastigar* hearing, holding that "[t]he government had ample opportunity to attempt to satisfy its burden under *Kastigar* in the lengthy hearing in the court below." *Id.* at 1491 n. 54.

I would remand the case solely for the district court to perform a harmless error analysis, the government having failed to establish that it did not violate Schmidgall's rights under the Fifth Amendment as construed in *Kastigar.**

* If the *Kastigar* error is determined to be harmless, I concur in the court's treatment of the sentencing issue in this case.