UNITED STATES of America,
Plaintiff–Appellee,

v.

Christian SCHMIDGALL,
Defendant–Appellant.

No. 92–6449.

United States Court of Appeals,
Eleventh Circuit.

July 14, 1994.

---

* If the *Kastigar* error is determined to be harmless, I concur in the court's treatment of the sentencing issue in this case.

Philip M. Gerson, Miami, FL, for appellant.

Robert J. McLean, Jack W. Selden, John E. Ott, Asst. U.S. Atty., Dept. of Justice, U.S. Attorney's Office, Birmingham, AL, for appellee.

Before KRAVITCH, ANDERSON and EDMONDSON, Circuit Judges.

ANDERSON, Circuit Judge:

This case involves another claim by Defendant–Appellant Christian Schmidgall that his Fifth Amendment right against self-incrimination was violated because law enforcement authorities used his immunized testimony in obtaining an indictment against him. This claim relates to an indictment in the Northern District of Alabama. Many of the relevant facts and much of the applicable law are discussed in an opinion, issued simultaneously with this opinion, regarding Schmidgall's similar challenge to an indictment returned in the Middle District of Florida. *United States v. Schmidgall*, 25 F.3d 1523 (11th Cir.1994).

The indictment at issue here was based on Schmidgall's participation in a venture that resulted in the importation of 512 kilograms of cocaine into Sumter County, Alabama in December of 1985. The venture was organized by William Wood. Schmidgall served as a radio specialist: monitoring law enforcement transmissions, maintaining contact with the small airplane carrying the cocaine from Colombia, and communicating with the ground crew at a rural airstrip where the plane was to land. He operated from a mobile home on a hunting camp owned by some of the co-conspirators. The cocaine was flown to a landing strip on another hunting camp,[1] then transported to the camp at which Schmidgall was located. The cocaine was then taken by automobile to Florida, where it was distributed.[2]

## THE SEQUENCE OF INTERVIEWS

The first account of Schmidgall's participation in this venture came from a November 11, 1987 interview with David Carlson, one of William Wood's pilots in smuggling ventures. Carlson told Customs Agent Donald Schmidt[3] that he flew a person he knew only as "Chris" from Florida to Alabama. Carlson identified Chris as a former commercial airline pilot and a counter-surveillance specialist. Chris loaded a large piece of equipment onto the plane, which he told Carlson was a spectrum analyzer that aided in monitoring law enforcement frequencies.

Further details of the Alabama operation were provided by Wood himself during his initial interview at a federal penitentiary in Kentucky on November 19, 1987. Wood was the coordinator of the importation, as well as serving as one of the pilots who flew the cocaine from Colombia to Alabama. He stated that Schmidgall (identified by his full name) "ran radios" for this operation by using spectrum analyzers to monitor law enforcement frequencies.

The next statement came from Howard Carrell, Wood's brother-in-law and another conspirator, on December 29, 1987. Carrell identified Schmidgall as the radio operator for marijuana airdrops in Florida; he also gave details of the Alabama importation, but did not identify Schmidgall as a participant in that venture.

Wood was debriefed again on January 12, 1988, providing yet more details about the Alabama venture. He related that he and his copilot were in constant radio contact with Schmidgall, who was at the hunting camp in Sumter County.

On January 26, 1988, defendant Schmidgall was interviewed in Miami by several law enforcement agents from the Southern District of Florida (not including Agent Schmidt). Although no formal report of this interview was made, the record includes five pages of handwritten notes apparently made by an Internal Revenue agent present at the debriefing. The government concedes that Schmidgall was granted use and derivative use immunity for this interview.

As the investigation into the Wood conspiracy progressed, information was gathered from dozens of sources. An increasing number of jurisdictions became involved. We will briefly describe those events relevant to this appeal.

Beginning in April 1988, Wood was extensively debriefed by many government agents pursuant to a plea agreement. The interviewers included Agent Schmidt, Customs Agent Ronald Ingleby from the Southern District of Florida, and Customs Agent Mike Holt from the Northern District of Alabama. Ingleby had been present at the January Schmidgall interview. Schmidt had been given a copy of the notes of that interview prior to the April Wood interviews. Three reports were produced from these extensive interviews of Wood: one from Schmidt, one from Ingleby, and a third produced by Customs Agent Thomas Coram. The Coram report

---

1. The owner of the hunting camp with the airstrip had no knowledge that his property was being used in a drug-smuggling operation.

2. The smugglers brought the drugs into the country via Alabama because of increased law enforcement presence in Florida.

3. Schmidt worked out of the Middle District of Florida and was the primary investigator in the early stages of the Wood case. He conducted all the relevant interviews before the January 26, 1988 Schmidgall interview.

was the result of a debriefing of Agent Holt in September of 1988; prior to that time, Coram had taken over the investigation in the Northern District of Alabama upon Holt's promotion.

On October 20, 1988, Agent Coram interviewed Tony Chambless, an Alabamian who was involved in the December 1985 importation. Chambless had initially been identified (by first name only) by Wood in the April interviews. The Coram report stated that Wood identified "Tony ... from Demopolis" as a white male in his mid–30s, five feet ten inches tall, weighing 180 pounds, with dark hair and a beard, who worked for a paper company in the Demopolis area. This detailed description led to Alabama authorities identifying Chambless, who eventually entered a plea and gave a statement. Chambless did not know Schmidgall, but was able to identify him through a photo lineup as the radio operator at the hunting camp during the December 1985 importation. He gave authorities a few details about the setup of Schmidgall's equipment.

Agent Coram and others conducted an interview of Schmidgall on December 5, 1988. The district court in this case found that Schmidgall was granted use and derivative use immunity for statements made at this interview; the government does not challenge that finding. Schmidgall had traveled to Birmingham pursuant to a subpoena. He gave details regarding the December 1985 venture, but apparently provided nothing not revealed in his January 1988 statement. Schmidgall was scheduled to return the following day, but failed to show up after a dispute over immunity arose.

On August 23, 1989, Agent Coram interviewed Steve Purvis, who had been involved in the Alabama smuggling. Purvis had first been identified by Wood on January 12, 1988. In the interview, Purvis confirmed previously revealed aspects of Schmidgall's participation and added a few details, such as the use of a stripped copper wire strung in a tree as an antenna.

■ Agent Coram testified before the grand jury on December 4, 1990, relating details of the Alabama venture including Schmidgall's participation.[4] The grand jury returned the indictment that is now challenged by Schmidgall.

## DISCUSSION

The district court held a *Kastigar*[5] hearing to determine whether Schmidgall had been granted immunity during the December 5, 1988 interview and, if so, whether evidence derived from that interview was used to obtain his indictment. The court also considered Schmidgall's allegation that information obtained during his immunized January 26, 1988 interview in Florida had been used against him. As we have noted, the court concluded that both interviews were given under use and derivative use immunity.

■ The court held that the relevant issue "is whether the government has met its burden of showing that *its evidence* presented to the grand jury *is not tainted*." *United States v. Schmidgall*, No. CR90–PT–261–S (N.D.Ala. Jan. 13, 1992), at 4 (emphasis in original). As we have explained in the companion to this case, the focus on the evidence actually used by the government in obtaining the indictment is a correct application of

---

4. Coram, the sole grand jury witness against the defendant, had participated in the December 5, 1988 interview of Schmidgall and thus plainly had been exposed to immunized testimony. In addition, Coram had reviewed certain investigatory reports—such as those of Agents Ingleby and Schmidt—that might have been indirectly tainted by Schmidgall's January 26 interview. Coram was unaware of any potential *Kastigar* problem until immediately before his grand jury testimony, when Assistant United States Attorney Joe McLean—who questioned Coram before the grand jury and also had been exposed to immunized testimony—told Coram not to divulge any

information learned from Schmidgall. The conclusory denials of Coram and McLean regarding the use of immunized testimony alone are not enough to carry the government's burden under *Kastigar*. *United States v. Hampton*, 775 F.2d 1479, 1489 (11th Cir.1985). However, as we explain *infra*, our focus must be on the evidence actually presented to the grand jury.

5. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). A detailed explanation of *Kastigar* is included in our opinion addressing Schmidgall's Florida indictment. *See* 25 F.3d at 1528.

*Kastigar* and the cases interpreting its principles in this Circuit. We therefore affirm the district court in rejecting Schmidgall's argument that any investigator exposed to immunized information is *per se* tainted.

■ After examining Agent Coram's grand jury testimony, the district court found that the majority of the information presented was known to investigators before Schmidgall gave his first immunized statement in January 1988. Proof of reliance on information gathered prior to the taking of immunized testimony generally is sufficient for the government to carry its burden under *Kastigar*. *See United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir.1985). Upon our own review of Coram's grand jury testimony, we agree with the district court. Most of the information presented was first revealed in interviews with Carlson, Carrell, and Wood (in the two interviews of Wood prior to January 26, 1988). With regard to this evidence, the government has proven that there is no taint.

Before the grand jury, Coram also referred to Tony Chambless and Steve Purvis. The district court found this more problematical because Chambless was not interviewed until October 20, 1988 (after the first immunized Schmidgall interview) and Purvis was not interviewed until August 23, 1989 (after the second Schmidgall interview). In addition, Chambless and Purvis were interviewed by Agent Coram, who had access to materials that were possibly tainted by the first Schmidgall interview and who conducted the second Schmidgall interview himself. The district court correctly observed that *Kastigar* prohibits the use of immunized testimony as an "investigatory lead," *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1664–65; therefore, if Schmidgall first identified Chambless or Purvis, or if information from Schmidgall was used to shape the interrogation of either witness, Coram's grand jury testimony would be tainted. The district court referred consideration of the evidence regarding Chambless and Purvis to a magistrate judge. We first will discuss and review the findings relating to Chambless, then turn to Purvis.

## A. Chambless .

■ The magistrate judge conducted a thorough review of the voluminous record in this case.[6] He determined that the initial lead to the identity of Chambless was provided by Wood during his extensive debriefings in April 1988. We agree with the magistrate judge's finding. Wood first identified Chambless by first name only in April 1988, but also provided a detailed description of him, including physical attributes, area of residence, and type of employment. Because this interview came after the first Schmidgall interview, the magistrate judge considered whether anything Schmidgall said was used to prompt Wood's identification of Chambless. The notes of the January 26, 1988 Schmidgall interview never mention Chambless. As the magistrate judge noted, the evidence supports the finding that Schmidgall did not know Chambless; the two had only a brief encounter at the hunting camp in December 1985. No person who was present at the Schmidgall interview—including Schmidgall himself—asserted that Schmidgall identified Chambless.[7] The lack of reference to Chambless in the notes of the Schmidgall interview is additional evidence rebutting any inference that Schmidgall provided information that allowed authorities to elicit the description of Chambless given by Wood. We agree with the magistrate judge

---

6. The record—which we have also given a complete review—includes lengthy transcripts of *Kastigar* hearings from several districts, as well as many investigative reports and other materials.

7. Present at both Schmidgall interviews was Coast Guard Lt. David Hume, to whom Schmidgall had been providing information on unrelated smuggling operations. Hume testified that he made notes at both interviews; however, these notes were seized by the Coast Guard and classified as national security information. At oral argument, Schmidgall's counsel argued that Hume's notes show that Schmidgall identified both Purvis and Chambless in his January interview. Counsel claimed to have moved the district court to order production of the Hume notes, and argued that we should direct the district court to rule on this motion. This argument was not raised in Schmidgall's brief, so we decline to address it. *American Steel Building Co. v. Davidson & Richardson Const. Co.*, 847 F.2d 1519, 1522 n. 4 (11th Cir.1988). In any event, identification of Purvis would be irrelevant because he was earlier identified by Wood.

that the government proved it had wholly independent sources leading to the identification of Chambless.

The magistrate judge then considered whether any of the statements obtained from Chambless and used before the grand jury were tainted. He found, and the district court agreed, that the Chambless interview was not tainted. Upon our examination, we conclude that the government has proven that the use of information elicited from Chambless before the grand jury did not violate Schmidgall's Fifth Amendment right against self-incrimination. As we have pointed out, Schmidgall's participation in the smuggling venture was well documented before any immunized testimony was taken. Chambless added only minor points: that Schmidgall[8] was in a back bedroom of the mobile home at the hunting camp hooking up radios and scanners and talking on the radio, and that a scanner was placed on a television in the den. These additional details add little to the information known to the prosecution before any immunized statements were taken. It is true, however, that Chambless actually saw Schmidgall at the site, although there was ample other evidence that he was there. We need not decide whether Chambless added so little to the evidentiary picture as to be harmless, because we conclude in any event that Chambless' identification of Schmidgall was not tainted. We noted above that nothing in the Schmidgall notes led the investigators to Chambless. Furthermore, none of the few details that Chambless added to the investigative knowledge are present in the notes of the January Schmidgall interview, suggesting that none of the information elicited from Schmidgall was used directly or indirectly to influence the statement of Chambless. The government is not required to negate every abstract possibility of taint. *United States v. Byrd,* 765 F.2d 1524, 1529 (11th Cir.1985). The prosecution has carried its burden of proving an absence of taint by a preponderance of the evidence. *Id.*

### B. Purvis

The magistrate judge found that, like the identification of Chambless, the identification of Purvis was first provided by Wood in April 1988. However, we point out that Purvis in fact was first identified as a participant in the Alabama smuggling by Wood on January 12, 1988—*before* the first immunized Schmidgall interview. Therefore the identification of Purvis clearly was free of any taint.

As the magistrate judge noted, analysis of the Purvis statement for potential taint presents a more difficult problem. Purvis was interviewed *after* Schmidgall's December 1988 Birmingham statement. In addition, the Purvis interview was conducted by Agent Coram, who had also led the December Schmidgall interview. The actual interrogation of Purvis was not recorded, so we are unable to compare the information elicited from Schmidgall with the questions posed to Purvis to determine if the former shaped the latter. The magistrate judge therefore compared Coram's reports of the Schmidgall and Purvis interviews, finding a great deal of similarity between them. Details such as the use of a partially stripped copper wire thrown into a tree as an antenna appear in both reports. Of course, the similarity simply may be due to the fact that Schmidgall and Purvis were independently recalling the actual facts of the venture. However, the government has the burden of proving that it did not impermissibly use Schmidgall's statement. The magistrate judge noted that the record simply contains no direct evidence regarding whether the government used Schmidgall's testimony to shape the interrogation of Purvis. Because the burden of disproving taint is allocated to the government, the lack of evidence would lead to a finding that the Purvis statement was tainted within the meaning of *Kastigar.*

The inquiry does not end at this point, however. Dismissal of the indictment is not required when use of the immunized testimony was harmless beyond a reasonable doubt. *United States v. Byrd,* 765 F.2d 1524, 1529 n. 8 (11th Cir.1985). The magistrate judge found that Purvis' testimony was used only to establish that Schmidgall was at the hunting camp during the smuggling venture,

---

8. We again note that Chambless did not know Schmidgall; he merely told authorities what the radio operator did, then identified Schmidgall as the operator from a photo array.

a fact that was also established by the independent, untainted testimony of several witnesses: Carlson, Wood (in his two interviews preceding the first immunized Schmidgall statement) and Chambless. We agree that Purvis' identification of Schmidgall as being present at the hunting camp is harmless beyond a reasonable doubt, in view of the overwhelming untainted evidence of that same fact. Moreover, we agree with the magistrate judge that the other details (*e.g.* stripped copper wire) provided by Purvis were insignificant and harmless beyond a reasonable doubt. Therefore, the indictment may stand.

### CONCLUSION

In sum, we find that the bulk of the evidence presented to the grand jury was known to investigators prior to the taking of Schmidgall's first immunized statement on January 26, 1988. Of the evidence offered to the grand jury that was gathered after that date, we find that the information taken from the statement of Tony Chambless was not tainted. The government has failed to prove that the statement of Steve Purvis was not tainted; however, the limited use of this information before the grand jury was harmless beyond a reasonable doubt.

AFFIRMED.