710 So.2d 729 (1998)
Pauline ZILE, Appellant,
v.
STATE of Florida, Appellee.
No. 95-2252.
District Court of Appeal of Florida, Fourth District.
May 20, 1998.
*731 Richard G. Bartmon of Law Offices of Bartmon & Bartmon, Boca Raton, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Melynda L. Melear, Assistant Attorney General, West Palm Beach, for appellee.
STONE, Chief Judge.
Appellant was convicted of one count of first-degree murder and three counts of aggravated child abuse. Except as to one count of child abuse, we affirm. As to count V, we reverse and remand for entry of amended judgment and sentence.
Appellant was the mother of the victim, Christina, and is married to John Zile. The family lived in a small one bedroom apartment with the couple's other two children. On September 16, 1994, John beat Christina so severely that he caused her death. Appellant was present and made no effort to interfere until after Christina lost consciousness.
Following the child's death, Appellant and John stored Christina's body in their closet for several days until John eventually buried the body. Together they purchased a shovel, tarp, and items to bury Christina, and Appellant made a public plea claiming that Christina had been kidnapped. She also pawned Christina's belongings.
Eventually, Appellant agreed to give an immunized statement about what happened. In this statement, she described the circumstances of Christina's death. Subsequent to her statement, after being told that Appellant had "told them everything," John confessed that he battered the victim and covered her face with his hand until she lost *732 consciousness. The evidence shows that Appellant was present during the battery and did not tell him to stop. During the incident, John was yelling at the little girl for defecating in her pants. After the abuse stopped, John was afraid to take Christina to the hospital. He told Appellant that she could call the police, that it was up to her, but Appellant decided against it. John's statement was not used at Appellant's trial.
Counts I and III of the information charged felony murder, with aggravated child abuse as the underlying felony for the September 16th homicide. Count II related to an incident occurring sometime between August 29 and October 1, 1994, when a neighbor heard Appellant slap and curse at Christina. Count V referred to an incident occurring between August 20 and September 15, 1994, in which John struck the victim as punishment while Appellant was in another room.
Appellant filed motions seeking dismissal of the case, suppression of evidence, and disqualification of the Palm Beach State Attorney's Office, alleging that information from her immunized statement had been used to convict and indict her. The trial court held a hearing and ultimately denied Appellant's motions. The trial court determined that the state had not used Appellant's immunized statement against her, and had independent sources for all evidence obtained.
Additionally, Appellant sought a change of venue because of significant pre-trial publicity. At trial, the judge excused approximately 80 of the 141 potential jurors, but denied the motion for change of venue, reasoning that the jury ultimately selected knew little about the case, and that all of the jurors stated that they could be fair and impartial and decide the case based on the evidence presented at trial.
Appellant contends that her fifth amendment rights were violated by the state's use of her immunized statement. See Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). However, the privilege against self-incrimination does not deprive the state of the authority to compel statements that may be incriminating, as long as the state grants immunity. Id. at 448, 92 S.Ct. at 1658. Section 941.04, Florida Statute provides:
Witnesses; person not excused from testifying or producing evidence in certain prosecutions on ground testimony might incriminate him; use of testimony given or evidence produced:
No person who has been duly served with a subpoena ... shall be excused from attending and testifying ... upon the ground or for the reason that the testimony or evidence, ... required of the person may tend to convict him or her of a crime or to subject him or her to a penalty or forfeiture, but no testimony so given or evidence so produced shall be received against the person upon any criminal investigation or proceeding.
Appellant also asserts that this statute violates Florida's constitution because it provides only use immunity and not transactional immunity.
Use immunity forbids the testimony to be used against the witness in any criminal prosecution of the witness. Transactional immunity would have provided complete immunity from prosecution for the matter concerning which the testimony was elicited. In Kastigar, the United States Supreme Court recognized that immunity from use and derivative use is sufficient to compel testimony over a claim of privilege. Id. at 453, 92 S.Ct. at 1661. The state is not required to offer transactional immunity. Id. The Supreme Court reasoned that:
The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being `forced to give testimony leading to the infliction of' penalties ..." Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony....
A person accorded this immunity under 18 U.S.C. § 6002, and subsequently prosecuted, is not dependent for the preservation of *733 his rights upon the integrity and good faith of the prosecuting authorities.
Id. at 453, 459, 92 S.Ct. at 1661, 1665 (citations omitted).
However, the Supreme Court did recognize that the government has the burden, faced with an immunity claim, of showing that its evidence is not tainted and comes from a legitimate independent source, adding:
This burden of proof, which we reaffirm as appropriate, is not limited to a negation or taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.
* * * * * *
This statute, which operates after a witness has given incriminatory testimony, affords the same protection by assuring that the compelled testimony can in no way lead to the infliction of criminal penalties. The statute, like the Fifth Amendment, grants neither pardon nor amnesty. Both the statute and the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources.
Id. at 460-63, 92 S.Ct. at 1665.
Transactional immunity is a creature of statute, State v. Schroeder, 112 So.2d 257 (Fla.1959), and does not implicate any constitutional provisions since Kastigar held that only use immunity is required. See State v. Williams, 487 So.2d 1092 (Fla. 1st DCA 1986); see also DeBock v. State, 512 So.2d 164 (Fla.1987). Florida Statutes § 914.04 previously provided for transactional immunity, but in 1982 the legislature amended the statute to provide for only use and derivative use immunity. The legislature, by making this change, obviously intended to eliminate transactional immunity, while keeping intact use immunity as required by Kastigar. See Novo v. Scott, 438 So.2d 477 (Fla. 3d DCA 1983).
Appellant argues that Florida's constitutional right to privacy somehow requires transactional immunity. However, such right to privacy does not arise unless a person has a legitimate expectation of privacy and no such legitimate expectation exists in the instant case. See State v. Conforti, 688 So.2d 350 (Fla. 4th DCA 1997). Appellant also seeks to draw a distinction between Florida's constitution and the federal constitution by pointing out slight differences in wording in the constitutions' self-incrimination provisions. Florida's constitution prohibits compelling a person to incriminate himself or herself "in any criminal matter." This provision is worded broader than the fifth amendment, which provides protection "in any criminal trial." However, we discern no reason why this difference in language would imply a requirement that immunity be transactional immunity.
Prosecution is not foreclosed because an immunized statement might have tangentially influenced a prosecutor's thought process, or because a "Chinese Wall" was not established. E.g. United States v. Montoya, 45 F.3d 1286, 1292 (9th Cir.1995); United States v. McGuire, 45 F.3d 1177, 1183-84 (8th Cir.1995); United States v. Schmidgall, 25 F.3d 1523, 1529 (11th Cir.1994); United States v. Bartel, 19 F.3d 1105, 1111 (6th Cir.1994); United States v. Harris, 973 F.2d 333, 337-38 (4th Cir.1992); United States v. Velasco, 953 F.2d 1467, 1474 (7th Cir.1992); United States v. Schwimmer, 924 F.2d 443, 446 (2d Cir.1991); United States v. Serrano, 870 F.2d 1, 17 (1st Cir.1989); United States v. Byrd, 765 F.2d 1524, 1530-31 (11th Cir. 1985). The Eleventh Circuit has recognized that, "Kastigar made no mention of any burden on the government to erect an impenetrable barrier between the prosecutors who hear or read the immunized testimony and those who decide to indict...." Byrd at 1529. Other courts have reasoned that the focus under Kastigar is not whether a prosecutor was aware of the contents of the immunized testimony, but on whether he or she used it. See Harris at 338; see also Abbott v. State, 438 So.2d 1025, 1026 (Fla. 1st DCA 1983).
Appellant argues that John's statement was motivated or influenced by his knowledge of Appellant's immunized statement. See United States v. North, 920 F.2d *734 940 (D.C.Cir.1990) (derivative use of an immunized statement includes situations where a witness' statement or testimony is motivated or influenced by the immunized information.). Immediately after Appellant gave her immunized statement, Detective Brochu and Investigator Ross went to see John. Ross testified at the Kastigar hearing that Brochu told John that Appellant had given "a complete statement," and had told the police "what happened." The state further admitted that John had been told by police that "we have spoken to your wife, we know what's going on. Why don't you tell us, you know, tell us your side of the story." Appellant asserts that these undisputed facts are sufficient to show that John was motivated and influenced to give his statement based on Appellant's immunized statement. However, the state presented substantial evidence and testimony which established that John was not influenced or motivated to talk based on his knowledge that Appellant had given a statement. At the time John gave his statements, he had not been told that Appellant was given immunity. John was not told about the content of Appellant's statement and did not ask about it.
Detective Brochu testified that John initiated contact with him, and that he did not use any information obtained from Appellant in asking John questions. He said that he informed John that he was being charged with first-degree murder, and advised John of his rights with regard to giving a statement. John said he wanted to do the right thing. Brochu never told John about the content of Appellant's statement. He said that John appeared to want to do the right thing and tell them where the victim's body was located.
Detective Perez confirmed that John told Brochu that he wanted to do the right thing. Perez said that when Brochu informed John that he was being arrested for first-degree murder, John jumped up and said that premeditation was needed for that and that "this wasn't premeditated." John said that he wanted to do the right thing and would tell them what they wanted to know.
FBI agent Mark Almeida testified that when Perez was getting booking information from John, John said that he wanted to speak with some of the investigators about the case, and subsequently John indicated that he might be willing to speak with the investigators if it would be beneficial to him. Almeida confirmed that John made a spontaneous statement that what happened was not premeditated and that he would provide information about the location of the victim. Almeida testified that he never even knew about Appellant's statement, and he could not have communicated to John something about which he did not know. Almeida said that it was his opinion that John wanted to talk in an effort to reduce the severity of the charges or penalties.
A witness' mere knowledge that a coconspirator has given a statement which implicated the witness is not sufficient to taint the witness' testimony. See United States v. Biaggi, 909 F.2d 662, 669 (2d Cir.1990) (the government should have an opportunity to persuade the trial judge that the witness would have provided adverse testimony entirely apart from the motivating effect of the immunized statement); United States v. Brimberry, 803 F.2d 908 (7th Cir.1986). John Zile was already a suspect before Appellant gave her statement. There is sufficient evidence to support the trial court's finding that John's statement was not motivated by Appellant's immunized statement.
Similarly, the medical examiner's testimony was not tainted. Dr. Benz testified that he performed an autopsy on the victim, and completed his report that same day, before he saw a copy of the police report, which simply confirmed his already stated conclusions. Dr. Benz did not sign the report until November 19, 1994, but he testified that he did not change his report after he completed it on October 28, and delayed issuing his report only to wait for test results which confirmed his earlier findings. Benz said that he did not use any facts in Appellant's or John's statements in reaching his findings. Possession of corroborating immunized information is not sufficient, alone, to taint independently obtained evidence. See United States v. Schmidgall, 25 F.3d 1523, 1530 (11th Cir.1994); United *735 States v. Schwimmer, 924 F.2d 443 (2d Cir. 1991).
We note that there was also evidence that independently supports Appellant's arrest and conviction, including a lack of corroborating witnesses to her claim that the child was kidnapped at a swap shop, blood samples taken from the apartment, statements from neighbors who heard the victim's screams, and school records. The sheriff's office had already interviewed the Ziles' young sons, who told them that John beat the victim's butt, that Appellant and John did not like the victim, and that the victim was dead. A relative had reported to the sheriff's office that Pauline might be involved in the victim's disappearance. Appellant's mother told the sheriff's office that something was wrong because the Ziles had checked out of their hotel on the day they failed to keep their appointment with the police. The police also knew about the Ziles' purchase of a shovel and tarp.
Dayle Ackerman, who lived in an apartment just behind the Ziles, testified that on the morning of Christina's death, she heard a man say, "Why did you shit on the floor in front of me?" She heard sounds of hitting and crying, which became muffled. The girl was crying and screaming. Ackerman believed that the beating occurred in the kitchen. One or two minutes after hearing Christina's voice become muffled, she heard a woman say, "that's enough John," and heard John crying "Oh my God, my God, what did I do?" Other witnesses corroborated that abuse had been taking place in the home for some time.
Regarding the trial court's denial of Appellant's motion for change of venue because of overwhelming publicity, we find no abuse of discretion. The test for determining whether a change of venue is required is "whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and pre-conceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom." Rolling v. State, 695 So.2d 278, 284 (Fla.1997); Cole v. State, 701 So.2d 845, 853 (Fla.1997).
In exercising its discretion, a trial court must make a two-pronged analysis, evaluating: (1) the extent and nature of any pre-trial publicity; and (2) the difficulty encountered in actually selecting a jury. Rolling at 284. Pre-trial publicity, standing alone, will not require a change of venue. Id. at 285. Resolution requires the trial court to examine the extent of difficulty in actually selecting an impartial jury. If voir dire shows that it is impossible to select jurors who will decide the case on the basis of the evidence, rather than the jurors' partiality or extrinsic knowledge, then a change of venue is required. To be qualified, jurors need not be totally ignorant of the facts of the case, nor do they need to be free from any preconceived notion at all:
To hold that the mere existence of any preconceived notion as to the guilt of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented.
Rolling at 285, quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961).
Here, there were hundreds of pretrial newspaper articles publicizing the case, and many hours of television video, reaching a large segment of the population. Much of the material was inflammatory. Some reports made a connection between Appellant and Susan Smith, a woman who had recently murdered her two children by drowning, a nationally publicized case.
We note, however, that Rolling, involving the murder of several university students in Gainesville, also received nationwide attention and every member of the venire had some extrinsic knowledge of the case, yet no change in venue was required. Similarly, in United States v. Lehder-Rivas, 955 F.2d 1510 (11th Cir.1992), pre-trial publicity calling the defendant a "drug kingpin" and "narco terrorist," and reference to the defendant's *736 fascination with the Third Reich did not trigger a finding of presumed prejudice.
Every member of the jury who sat in the instant case indicated that they would be able to set aside any pre-conceived opinions or prejudice and decide the case solely on the evidence presented. They stated that they were confident that whatever they heard in the news would not impact their decisions and that they would rely only on what they heard in the courtroom.
The trial judge said that he was confident they had found a very good and impartial jury. The judge noted that five of the jurors either had not heard of the case or had very minimal knowledge, and the other five only knew a little about the case. The judge recognized that two of the jurors knew quite a bit about the case, but the defense did not seek to strike those jurors for cause. Further, those two jurors said that they were confident that they could set aside what they did know.
We recognize that a high percentage of the jury pool, around 57%, was disqualified for having preconceived opinions of guilt or because they could not put aside their prejudices. However, even where a substantial number of prospective jurors admit forming an opinion, community prejudice need not be presumed. Rolling at 285. The number of prospective jurors who were excused in this case was high because the judge liberally struck for cause prospective jurors where either the judge or the juror was not confident that they could set aside what they knew or their prejudices. The judge commented that only one defense challenge for cause was denied and that prospective juror was not seated. Further, Appellant did not exhaust all of her peremptory challenges. See Gaskin v. State, 591 So.2d 917 (Fla.1991), vacated on other grounds, 505 U.S. 1216, 112 S.Ct. 3022, 120 L.Ed.2d 894 (1992); see also Rolling at 285.
The Florida Supreme Court has been reluctant to reverse based on a refusal to grant a change of venue motion, even where there was very significant pre-trial publicity. See Rolling; Cole; Farina v. State, 679 So.2d 1151 (Fla.1996), overruled in part on other grounds, Franqui v. State, 699 So.2d 1312 (Fla.1997); Wuornos v. State, 644 So.2d 1000, 1007 (Fla.1994); Bundy v. State, 471 So.2d 9, 19 (Fla.1985). We recognize that the Third District did reverse a trial court's decision to deny a change of venue in Lozano v. State, 584 So.2d 19 (Fla. 3d DCA 1991), where a police officer was charged with manslaughter after killing a motorcycle rider. However there, shortly after the killing, there were threats of extensive riots if the defendant was acquitted, and various jury members stated that they were fearful of the consequence of an acquittal.
The evidence at trial was sufficient to support the trial court's denial of Appellant's motions for judgment of acquittal on charges of felony murder by aggravated child abuse. Appellant was charged under two theories. First, felony murder, with aggravated child abuse as the underlying felony. Second, the state argued that Appellant was guilty as a principal under section 777.011, Florida Statutes.
At the time of Appellant's trial, Florida's aggravated child abuse statute § 827.03 (1995), since amended, provided as follows:
(1) "Aggravated child abuse" is defined as one or more acts committed by a person who:
(a) commits aggravated battery on a child;
(b) willfully tortures a child;
(c) maliciously punishes a child; or
(d) willfully and unlawfully cages a child.
Section 827.01(3) defines "torture" as "every act, omission, or neglect whereby unnecessary or unjustifiable pain or suffering is caused."[1] The state argued at trial that Appellant was guilty of aggravated child abuse by failing to protect Christina the night John beat her to death. The supreme court has recognized that acts of omission can constitute torture under Florida's child *737 abuse statute. See Nicholson v. State, 600 So.2d 1101 (Fla.1992).
In Nicholson, a defendant appealed her conviction for first-degree felony murder and aggravated child abuse. The child had died of starvation, and the defendant had controlled the child's diet, directed the punishment of the child, and prohibited the child from eating when she was offered food by third persons. The court, in construing the definition of "torture," held that the aggravated child abuse statute included not only willful acts of commission, but also willful acts of omission and neglect that cause unnecessary or unjustifiable pain or suffering to a child.
In State v. Carwile, 615 So.2d 748 (Fla. 2d DCA 1993), the court reversed a trial court dismissal of a first-degree felony murder by aggravated child abuse charge. The defendant's daughter had somehow sustained head injuries and exhibited serious symptoms for a period of time, but the defendants failed to get medical attention and the child died four days later. The Second District, in reversing, recognized that intent to commit aggravated child abuse through omissions was an issue of fact.
On this record, the jury could have determined that Appellant failed to execute her duty to protect the victim by standing by and allowing John to punish the victim so severely. Appellant knew that the abuse was taking place, it was in her presence, and even the neighbors heard the victim's screams and her muffled voice after John covered her mouth. The abuse took place in two rooms of the small one bedroom apartment, Appellant's voice was heard by neighbors, and there was blood throughout the apartment. Appellant allowed the assault to continue until the child had lapsed into unconsciousness, at which time Appellant said "that's enough John," in a calm and quiet voice. The jury could have found that the evidence suggested that Appellant approved and condoned the attack up until the victim lost consciousness, and willfully intended the beating or torture to continue. The jury could also conclude that this prolonged abuse caused Christina "unjustifiable pain or suffering," as defined in § 827.01(3).
However, we do reverse Appellant's conviction of aggravated child abuse concerning a separate incident charged in count V of the information. As to that incident, the evidence reflects that Appellant was in a different room, with the door closed, when John hit Christina with his belt four times, taking "half swings." As to that incident, there is no evidence that Appellant participated or was in a position to stop it. As to all other issues raised, we affirm.
With respect to Appellant's additional Kastigar claim involving testimony before the grand jury, we affirm on the authority of United States v. Kuehn, 562 F.2d 427 (7th Cir.1977) and United States v. Helmsley, 941 F.2d 71 (2d Cir.1991).
Therefore, as to count V, we remand to amend the judgment and sentence accordingly. As to all other issues, we affirm.
GUNTHER and POLEN, JJ., concur.
NOTES
[1] The child abuse statute was substantially amended in 1996 after the trial. The amended version's definition of child abuse includes intentional acts and/or "active encouragement of any person to commit an act that results or could reasonably be expected to result in physical or mental injury to a child." Fla. Stat. § 827.03(1)(c).