UNITED STATES of America, Appellee,

v.

Jeffrey WILEY, Appellant,

UNITED STATES of America, Appellee,

v.

Curtis HOLUB, Appellant.

Nos. 92–2469, 92–2497.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 14, 1993.

Decided June 28, 1993.

Nancy Hollander, Albuquerque, NM, argued, for Jeffrey Wiley.

John Wesley Hall, Jr., Little Rock, AR, argued, for Curtis Holub.

Steven M. Colloton, Asst. U.S. Atty., Cedar Rapids, IA, argued (Patrick J. Reinert, Asst. U.S. Atty., on the brief), for U.S.

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

RICHARD S. ARNOLD, Chief Judge.

Jeffrey Wiley and Curtis Holub appeal their convictions and sentences for distribution of marijuana and other related offenses. We affirm.

## I.

Wiley owned and operated a motorcycle shop in Marion, Iowa. In addition to repairing motorcycles, Wiley used the business to store and distribute marijuana. He served as a source in a drug conspiracy involving Holub and several others.

Early in 1988, federal drug-task-force agents began investigating this conspiracy. On February 11, Chris Mottinger, who was cooperating with the agents and wearing a recorder, obtained a sample of marijuana from Holub at Holub's home. A few days later, an informant named Newland recorded a conversation between himself, Kevin Meggers, and Wiley, in which they discussed Wiley's drug trafficking. Another cooperating individual, Barton Hoffman, recorded a conversation between himself and Meggers, in which Meggers described Wiley's drug activities. On February 19, Holub sold one pound of marijuana to Mottinger and an undercover agent. He also negotiated another sale with the agent of 50 pounds of marijuana, which was to occur on February 22. On that day, Holub went to Meggers's house

to get the marijuana. Wiley was supposed to have delivered it to Meggers. Meggers did not have the marijuana, and the sale between the agent and Holub never took place. At this same time, Pat McMickle was purchasing 82 pounds of marijuana from Wiley at Wiley's shop. McMickle testified that Wiley sold to him rather than to Meggers because Wiley thought McMickle was a better salesman.

McMickle immediately sold the marijuana to an undercover agent and was arrested. He agreed to cooperate and identified Wiley as the person who sold him the marijuana. McMickle also told Agent Badger that Wiley had more marijuana stored in the garage. In cooperation with the federal task force, McMickle returned to Wiley's shop wearing a recorder and told Wiley that the purchasers had not shown up. Shortly thereafter, agents approached and took both McMickle and Wiley into custody.

The agents took Wiley to a motel room, told him they had seized the 82 pounds of marijuana from McMickle, and said they were interested in his cooperation. Although no one advised Wiley of his rights under *Miranda*, Agent Badger testified that he informed Wiley that if he agreed to cooperate and plead guilty to conspiracy to distribute marijuana, the statements he made would not be used "to formulate additional charges." Wiley claims, however, that Agent Badger said that the information he provided would not be used against him at all. At any rate, Wiley talked and also consented to a search of his business. He gave names of others to whom he was dealing drugs and a very brief sketch of their activities.[1] In the motorcycle shop, Wiley gave them over 30 pounds of marijuana, scales, and a notebook of drug-transaction records. Wiley later decided not to cooperate.

On September 26, 1991, a grand jury indicted Holub,[2] Wiley, and two others, Ronald

---

1. Of the half-dozen persons mentioned by Wiley in his statement, only one, Patrick McMickle, testified against him at trial. McMickle was an employee of the motorcycle repair shop. Wiley indicated in his statement that he had been dealing with McMickle since August of 1987, and that there had been approximately ten one-pound

deals, six five-to-ten-pound deals, six 25–pound deals, and four 50–pound deals. The largest deal was the 82 pounds picked up that night.

2. Holub had already been indicted in a nine-count indictment on December 14, 1988. The District Court dismissed this indictment without

Tank and Craig Pflughaupt.[3] Count 12 charged all four of them with conspiracy to distribute marijuana. In Counts 1, 2, 3, 5, 8, and 9, the indictment charged that Holub used a communications facility to facilitate the distribution of marijuana. .Holub was also charged with two counts of distributing marijuana, Count 4 and Count 6. Count 7 charged Wiley with distribution of 82 pounds of marijuana, and Count 10 charged him with possession of an additional 30 pounds with the intent to distribute. In Count 11, the indictment charged that Wiley managed and controlled a building for the purpose of storing and distributing a controlled substance. Finally, Count 13 sought the forfeiture of Wiley's business. Holub entered a conditional plea of guilty to Counts 1, 4, 6, and 8, reserving the issue of whether the first indictment should have been dismissed with prejudice under the Speedy Trial Act. Wiley went to trial and was convicted by a jury of Counts 7, 10, 11, and 12. The Court sentenced Wiley to 188 months' imprisonment, three years' supervised release, an $83,200 fine, and a $50 special assessment on each of the four counts. The jury also found that his business was forfeitable. These appeals followed.

## II.

Wiley first contends that the District Court erred in denying his motion to dismiss the indictment because the government used immunized statements against him in violation of the immunity agreement between him and the government. Wiley argues that Agent Badger told him that the information he provided would not be used against him. The government claims that Agent Badger told Wiley that the information he provided would not be used to formulate additional criminal charges against him—that is, in addition to charges about which the government already had information—but would be provided to the Court as part of the relevant conduct for sentencing. After a two-day hearing on the issue, the District Court believed the government as to the substance of

the agreement and held that enough information existed before Wiley gave his statement to charge him with the four crimes charged in the indictment. The Court also held that the government did not use information provided by Wiley to formulate additional charges. We are persuaded neither that the Court's finding as to the substance of the agreement is clearly erroneous nor that its holding regarding the use of that agreement is in error.

### A.

On the substance-of-the-agreement issue, Wiley argues that since agents Knott and Noonan testified that the standard procedure at that time was to grant full use immunity, the District Court's finding believing Agent Badger is clearly erroneous. We disagree. As a preliminary matter, we note that it is very difficult to prove that a court's assessment of credibility was clearly erroneous when that court, not this Court, had the opportunity to observe and listen to the witnesses. Agent Badger, not Captain Noonan or Lieutenant Knott, was responsible for conveying the terms of the cooperation agreement to Wiley. Knott was not even present when this was done, and Noonan admitted that he did not know the details of the agreement. We see no clear error. Wiley's contention that written agreements between the United States Attorney's Office and other defendants contained different terms also does not convince us that the District Court's finding with regard to Wiley's oral agreement is clearly erroneous. There was no written agreement between the government and Wiley, and certainly no overwhelming evidence that the government would treat Wiley, an arguably bigger fish, as it treated these other defendants.

### B.

On the use-of-the-statement issue, Wiley points to the following "uses" of his statement in violation of the immunity agreement: the government used his statement to

---

prejudice on May 30, 1991, for violation of the Speedy Trial Act.

**3.** Tank and Pflughaupt pleaded guilty, cooperated with the government, and are not involved in this appeal.

382

induce Pat McMickle to testify; the government used his statement in formulating its strategy before the grand jury and at trial, determining which witnesses to call, deciding what evidence to present to the grand jury, and shaping its theory of prosecution; the government failed to prove that its evidence was obtained independently of the statement; and the government told the grand jury that Wiley made a statement admitting his guilt and later withdrew his cooperation. We reject Wiley's contentions.

First, McMickle had already decided to cooperate and implicate Wiley before he learned that Wiley had provided information on him. In fact, McMickle gave information on Wiley before Wiley was even arrested or questioned. In any event, the proof is substantial that McMickle's motive for assisting the government was solely to reduce his own sentence. Trial Transcript 722–23. Second, after an exhaustive review of the Motion to Dismiss Hearing Transcript and the Trial Transcript, we affirm the District Court's holding that there was abundant evidence gathered by the government through independent means, precluding us from concluding that the government's use of Wiley's statement in shaping its case, if it did so, had any effect on Wiley's substantial rights.

■ Next, we reject Wiley's claim that the government did not prove that the trial testimony of each witness was derived from a wholly legitimate, independent source. In rejecting this claim, the District Court explained that the argument ignored the nature of the agreement. We agree. The agreement here was not that the government would not use Wiley's statement, but that the government would not use Wiley's statement to formulate additional charges against him, and it didn't. Had the government brought charges in addition to the four charges supported by the evidence on February 22, 1988, it would have had to prove that the new charges were based on evidence that was derived from a "legitimate source wholly independent of the compelled testimony." *Kastigar v. United States,* 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972). Here, there was no requirement that the government prove this. In any event, we

agree with the District Court that the transcript of the Motion to Dismiss Hearing shows that the burden would have been met. See Motion to Dismiss Hearing Transcript 59–62, 75, 80–81, 100, 118, 194, 219.

■ Finally, Wiley contends that his statement was used at the grand jury when the government—by suggesting that Wiley had given a statement and then stopped cooperating—basically told the grand jury that Wiley had admitted his guilt. We do not agree with Wiley that this was a prohibited use of his statement. A member of the grand jury asked Agent Weisman why he was terminating the investigation into Wiley's suppliers. Agent Weisman's response was "it's just getting old and people really do start forgetting things and it starts to get more difficult to conduct an investigation." Grand Jury Testimony of Agent Weisman 6. An assistant United States Attorney then interjected that Wiley was approached with the possibility of cooperating and providing information on his sources, but that he eventually decided not to cooperate. *Ibid.* Weisman agreed and said "[h]e was debriefed on a day that he was confronted with the deal, and he provided some information, and then he got an attorney, and . . . stopped cooperating." *Id.* at 6–7. While we have doubts about this tactic on the part of the government, it is not a prohibited use of Wiley's statement. The substance of the agreement was not brought to the attention of the grand jury, nor was the statement used to formulate additional charges against him.

### III.

■ Wiley's next contention is that the District Court erred in denying his motion to suppress the evidence seized from his business. He claims that the seizure was tainted by the prior interrogation of him in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We agree with the District Court that a violation of *Miranda* occurred. The police handcuffed Wiley, took him to a motel room, and questioned him without reading him his rights as required by *Miranda.* That, however, is not the end of the analysis.

In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court rejected a fruit-of-the-poisonous-tree argument and held that a second confession, given after a proper *Miranda* warning, was admissible, although it came on the heels of an unwarned statement. The Court distinguished presumptive coercion, resulting from the absence of *Miranda* warnings, from actual coercion, resulting from improper police behavior. Unwarned statements, explained the Court, may be voluntary in fact. *Id.* at 307, 105 S.Ct. at 1292. If the unwarned statement was voluntary, and the allegedly tainted second statement was also voluntary, the second, warned statement is admissible. The Fifth Amendment, stated the Court, prohibits only the use of compelled testimony. *Id.* at 306–07, 105 S.Ct. at 1291–92.

Indirectly relying on *Elstad*, on facts similar to those here, this Court upheld the suppression of physical evidence obtained from a consensual search following an unwarned statement. See *United States v. Carter*, 884 F.2d 368 (8th Cir.1989). The Court reasoned that the government failed to prove that the consent was voluntary. We assume that if the Court had found the consent to be voluntary, the alleged "taint" would not have prevented the Court from admitting the evidence. By analogy to *Elstad* and *Carter*, the evidence seized here was admissible if both the unwarned statement and the consent to search were voluntary. The District Court's holding that they were is not clearly erroneous. The agents uncuffed Wiley in the motel room, told him he could consult with an attorney, and explained to him the benefits of cooperation. He chose to give a statement. For these same reasons, plus the fact that Wiley signed a consent-to-search form after having it explained to him, and the fact that during the search he gave the agents all of the inculpatory evidence, we agree with the District Court that Wiley consented to the search. We do not believe this consent was tainted by the earlier *Miranda* violation.

We also reject Wiley's related claim that the District Court erred in denying his motion to suppress evidence that he turned over his notebook to the police. The notebook contained records of his drug transactions. The argument is that his act of turning over the notebook was testimonial in nature, that is, "the notebook exists and it belongs to me." Since the agents did not first give the *Miranda* warnings, this testimony, argues Wiley, must be suppressed. This is the first time Wiley has made this specific objection. Before, he merely included the notebook in his objection to the search generally. The point is therefore not open for normal review on appeal, and we see no plain error in the ruling of the District Court.

## IV.

Wiley's next contention is that the District Court erred in denying his motions to voir dire the jury, preserve the jurors' notebooks, and declare a mistrial because of juror misconduct. Apparently, several jurors were overheard mentioning the materials compiled by the government to comply with *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), which requires the government to make available to the defense statements made by government witnesses. When the judge explained that the jurors could send him a note if they needed to speak with him about anything, one juror sent a note asking what the *Jencks* files were, if the jury could see them, and what happened to Exhibit 68. Trial Transcript 615–16. Another juror asked the courtroom clerk what Exhibit 68 was and said "we've been trying to figure it out." Trial Transcript 607–08. Wiley moved for a mistrial and also requested the Court to voir dire the jury. Finding no reason to believe that the jurors had been discussing the merits of the case, the Court decided to give a cautionary instruction rather than grant Wiley's motions.

The parties do not dispute that a district court has broad discretion in handling allegations of juror misconduct. See, *e.g., United States v. Baker*, 855 F.2d 1353, 1361 (8th Cir.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989); *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir.), *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977). We will not reverse its determination of whether there

has been misconduct, and if so, its actions in handling the matter, absent an abuse of discretion. We see no abuse of discretion here.

## V.

■ We next address Wiley's contention that there was insufficient evidence to establish that his business facilitated the crimes and that, therefore, this Court must reverse the forfeiture. While Wiley concedes that the evidence established a sufficient connection between the physical property and the criminal activity, he argues that there was no evidence that the actual business operation was used to commit or facilitate any crimes.

■ Our standard for reviewing the jury's finding of forfeiture is whether, in the light most favorable to the prosecution, any reasonable jury could have found the property forfeitable beyond a reasonable doubt. See *United States v. Cook*, 972 F.2d 218, 221 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 991, 122 L.Ed.2d 142 (1993). The evidence here showed that McMickle, one of Wiley's main marijuana distributors, worked for Jeff Wiley Enterprises. One could certainly infer that this employment situation facilitated their contacts for redistribution activities. McMickle also called the business from Wisconsin to discuss a drug transaction. In addition, the business had many legitimate customers, thus providing a cover for the drug traffickers who frequented the business. We uphold the jury's verdict of forfeiture.

## VI.

We now address Holub's contentions that the District Court erred in denying his motion to dismiss on the basis of a violation of his Sixth Amendment right to a speedy trial and in dismissing without prejudice the charges against him because of the government's violation of the Speedy Trial Act, 18 U.S.C. §§ 3161, 3162.

Holub was indicted on December 14, 1988, and the trial, initially scheduled for February 28, 1989, was postponed by order of the magistrate judge on February 27, 1989. The reason for the continuance was that the government and Holub's attorney, Stanley Roush, thought—albeit incorrectly—that they had reached a plea agreement. Negotiations continued through the fall of 1990. Apparently, the government sent a plea agreement to Roush in March of 1989 for Holub's signature. Holub told Roush that he rejected the offer, but Roush did not tell the government of the rejection until April of 1990. Roush explained that the delay was caused by Holub's telling him that he had personally called the United States Attorney's office to reject the offer and his informing Roush that he wanted a court-appointed attorney and a trial. Roush also knew that Holub had been receiving legal advice from an attorney in Washington, D.C. For the government's part, it failed to monitor the situation diligently. When the government finally learned in April 1990 of Holub's rejection of its offer, it made another offer through Roush, which Roush communicated immediately by letter to Holub. Holub did not respond. Finally, the government set a deadline of September 13, 1990, after which it would ask the Court to set the matter for trial. After receiving no response to his letters to Holub, Roush withdrew as counsel. The Court appointed new counsel and set the trial for March 19, 1991. The new counsel withdrew, and another attorney was appointed on February 8, 1991.

On February 20, 1991, Holub, through his third attorney, moved to dismiss the charges against him on the ground that the government had failed to bring him to trial within the time required by the Speedy Trial Act. He also moved for a dismissal under the Sixth Amendment. The magistrate judge found no Sixth Amendment violation, but recommended that the charges be dismissed with prejudice because of the government's violation of the Speedy Trial Act. The District Court agreed that the Act had been violated, but on March 31, 1991, dismissed the charges without prejudice.

On September 26, 1991, the government reindicted Holub. The District Court adopted the magistrate judge's Report and Recommendation finding that Holub had suffered no prejudice from the delay and denied his renewed motion to dismiss with prejudice on speedy-trial grounds. Holub then entered

a conditional guilty plea to four counts. He now appeals from the denial of his motion to dismiss.

### A.

First, Holub's claim that the District Court erred in denying his motion to dismiss based on the Sixth Amendment is not properly before us. Holub's conditional plea of guilty merely preserved his right to challenge the District Court's failure to hold that the charges from the first indictment should have been dismissed with prejudice under the Speedy Trial Act, thereby precluding the charges in this case. Government's Appendix 142. He did not preserve or raise the Sixth Amendment issue in his plea or before the court below. Federal Rule of Criminal Procedure 11(a)(2) specifically provides that a defendant may enter a conditional plea of guilty

> [w]ith the approval of the court and the consent of the government ... reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion....

Since the only written reservation concerned the Speedy Trial Act claim, we will not address Holub's Sixth Amendment claim.

### B.

■ Second, Holub argues that the District Court should have dismissed the first indictment with prejudice instead of without prejudice. Thus, he argues, the government should have been precluded from bringing the charges against him here.

■ When a district court finds a violation of the Speedy Trial Act, dismissal is mandatory. 18 U.S.C. § 3162(a)(2). The Act does not, however, require dismissal either with or without prejudice, and we will not disturb the District Court's ruling on the issue absent an abuse of discretion. United States v. Kramer, 827 F.2d 1174, 1179 (8th Cir.1987). The Act sets out the following factors for a court to use in determining whether to dismiss with or without prejudice:

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

18 U.S.C. § 3162(a)(2).

The District Court held that the charges against Holub were serious. Addendum to Holub's Brief 29. The Court also found that the cause of the delay was the government's failure to follow up on its proposed plea offers and Holub's failure to communicate his rejections of the offers to the government. Ibid. The Court further found that Holub had not been prejudiced by the delay and that the government had no history of delaying trials in that area. Id. at 30. For those reasons, the Court held that dismissal without prejudice was appropriate. Its holding is not an abuse of discretion.

### VII.

■ Next, the defendants challenge their sentences on various grounds. One of Wiley's contentions—that hearsay introduced at the sentencing hearing violated his right of confrontation under the Sixth Amendment—was disposed of by our decision in United States v. Wise, 976 F.2d 393 (8th Cir.1992) (en banc) (holding that the Confrontation Clause does not apply to the sentencing hearing), cert. denied, —— U.S. ——, 113 S.Ct. 1592, 123 L.Ed.2d 157 (1993). His second contention is that the basis the Court used to calculate the drug quantity when determining his base offense level was arbitrary, unreliable, and unrelated to the crime of which he was convicted. The sentencing court may take into account drugs not specified in the counts of conviction if those drugs were "part of the same course of conduct or common scheme or plan." U.S.S.G. § 1B1.3(a)(2). Furthermore, the quantity need be established only by a preponderance of the evidence, and we will not reverse the sentencing court's determination of drug quantity unless the defendant proves that determination is clearly erroneous. Wiley has not done that here.

■ Wiley claims that there was no evidence at the sentencing hearing to prove that the marijuana distributed by Don Raymond and Kevin Meggers was obtained from him. The government did, however, present evidence at trial that Wiley was the source of this marijuana. Trial Transcript 308, 579–80, 589–90, 834, & 881–83. Most of the drug-quantity evidence came in the form of testimony from Patrick McMickle, who Wiley claims was addicted to cocaine during the relevant time period and is completely unreliable. The District Court disagreed, and found McMickle to be a credible and reliable witness. We are not persuaded that the Court's finding on this issue is clearly erroneous.

■ In addition, we see no merit to Wiley's claim that the District Court erred in enhancing his offense level by two levels for obstruction of justice. The District Court believed the witnesses' testimony that Wiley threatened them with physical harm if they testified, and, once again, we cannot say this finding is clearly erroneous. Such a threat is clearly sufficient to justify the enhancement.

■ Finally, Holub challenges the two-level increase in his offense level under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm. He does not contend that he did not possess a firearm, but that the government did not prove the firearm was connected to the offense. Mottinger, a wired government informant, went to Holub's house to discuss a marijuana deal. When the two of them entered Holub's bedroom, Mottinger noticed a 9-millimeter gun in an open gun safe near the bed. We will assume that Holub is correct that the gun was not loaded, although he testified that he could load it and be ready to fire it in four or five seconds. In any event, Mottinger handled the gun for a moment, and then Holub returned it to the safe. A few minutes later, they went back to the living room, where Holub gave Mottinger the marijuana sample.

Holub argues that the enhancement does not apply since the gun had nothing to do with the drug transaction and was not even in the room where the transaction occurred. We agree that the gun was not involved in the sense that Holub did not directly threat-

en Mottinger with it to consummate the sale. The question here, however, is whether it is "clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, Application Note 3. The District Court's finding that it was not clearly improbable is not clearly erroneous. See *United States v. Streeter*, 907 F.2d 781, 792 (8th Cir.1990) (court upheld enhancement where unloaded guns were found on ground floor and marijuana found in attic); *United States v. Haren*, 952 F.2d 190, 198 (8th Cir.1991) (court upheld enhancement where guns were found in mobile home adjacent to sheds which served as the amphetamine labs).

## VIII.

Finally, defendants have submitted a portion of their briefs under seal, together with excerpts from the transcripts and related materials. We have considered the arguments made under seal with care. They are serious arguments. After considering all of the relevant factors, we hold that no error occurred affecting defendants' substantial rights.

The judgments are affirmed.