KRAVITCH, Senior Circuit Judge, concurring in part and dissenting in part:

I join Part IV.C of the majority opinion, which affirms Pielago's conviction, vacates his sentence, and remands his case for resentencing.[1] I respectfully disagree, however, with the majority's disposition of Varona's appeal. In my view, the government violated Varona's proffer agreement when, after indicting Hechavarria on the basis of Varona's immunized statement and entering into a plea agreement with him, it had Hechavarria testify against Varona concerning the very delivery of cocaine that she described in her statement.[2] Because the government had no legitimate and wholly independent source for Hechavarria's testimony, allowing the testimony was patent error. Moreover, the error was not harmless, given the fact that the government

---

[1] Vacating Pielago's sentence of 140 months is appropriate even though that sentence lies within the 121- to 151-month sentencing range that we prescribe upon remand. The district court imposed the 140-month sentence under the assumption that the sentencing range was 135 to 168 months. Because the district court did not clearly state that it would have imposed the 140-month sentence even if the sentencing range were 121 to 151 months, we must remand the case for resentencing. Cf. United States v. De La Torre, 949 F.2d 1121, 1122 (11th Cir. 1992) (declining to resolve a dispute as to which guideline range was applicable when the trial court made clear that the same sentence would have been imposed irrespective of the outcome of the dispute).

[2] In her statement, Varona admitted that on November 6, 1993, after her husband's arrest, she gave Hechavarria a scale for weighing cocaine and sold him the kilogram of cocaine that remained in the Varona home. Interview of Maria Varona, Gov. Ex. 49, at 2. Similarly, Hechavarria testified that Varona called him on November 6, after her husband's arrest, and asked him to come to the Varona home. Upon Hechavarria's arrival, Varona handed him a gray tool box, which, when opened by Hechavarria, revealed, inter alia, a weighing scale and a kilogram of cocaine. R6: 456-57.

1

introduced no other evidence at trial that would have allowed a reasonable jury to convict Varona. Varona therefore has established the elements of plain error. See United States v. Olano, 507 U.S. 725, 732-735, 113 S. Ct. 1770, 1777-78 (1993) (stating that plain error is clear or obvious error that affects substantial rights, in that it is prejudicial and not harmless).

Furthermore, correcting this error on appeal would be a proper use of this court's discretionary powers. Because Varona was sentenced to more than eight years of imprisonment for a conspiracy conviction based solely on evidence obtained in violation of her proffer agreement, I believe that the district court's error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." See Olano, 507 U.S. at 736-37, 113 S. Ct. at 1779 (citation omitted). I would reverse her conviction and remand her case for a new trial.[3]

## I.

Varona's proffer agreement, interpreted according to fundamental tenets of contract construction, prohibited the government from acting as it did in this case. According to Paragraph 3 of the proffer agreement, "no information or statement provided by Maria Varona may be used against [her] in this case or in any other criminal investigation. . . ."[4] Paragraph 4 merely

---

[3] I thus dissent as to Part IV.B of the majority opinion. I concur with Part IV.A, which rejects Varona's argument that the superseding indictment should have been dismissed.

[4] Proffer Agreement of Maria Varona, Gov. Ex. 48, at 1-2, ¶ 3.

2

qualified that protection by giving the government "the right to pursue any and all investigative leads derived from Maria Varona's statements or information and use such derivative evidence in any criminal or civil proceedings against her and/or others."[5] Interpreted together, Paragraphs 3 and 4 barred the government both from using Varona's "statements" against her and from using Varona's "information" against her in the most direct way possible. The government violated the latter prohibition by using Varona's information to prove, in the most direct way possible, that she distributed cocaine; on the basis of Varona's immunized statement that she delivered cocaine to Hechavarria, the government at Varona's trial procured <u>Hechavarria's</u> testimony about the <u>same</u> transaction.

I respectfully believe that the majority errs in ruling otherwise. Despite its initial admonition that, whenever possible, "no term of a contract should be construed to be in conflict with another," the majority concludes that the language of Paragraph 4 trumps the general term "information" in Paragraph 3. The majority thus holds that Paragraph 4 permitted Hechavarria's testimony as merely derivative evidence obtained from investigative leads. The majority's interpretation not only violates its own principle of contract construction but also effectively disregards the unique language of Paragraph 3. Unlike common proffer agreements that bar <u>only</u> the defendant's immunized <u>statements</u> from being used in the

---

[5] <u>Id.</u> at 2, ¶ 4. The agreement expressly stated that it did not impart "transactional immunity" to Varona. <u>Id.</u> at ¶ 7.

government's case-in-chief,[6] the proffer agreement in this case explicitly prohibited the government from using Varona's "statements or information" against her.[7] It is a time-honored principle of contract construction that contracts should be interpreted so as to give meaning to each and every word. See 17A Am. Jur. 2d Contracts § 387 (1991) (stating that no word in a contract should be rejected as mere surplusage if the court can determine any reasonable purpose for that word); id ("A

---

[6] See, e.g, United States v. Chiu, 109 F.3d 624, 626 (9th Cir. 1997) (stating that the defendant's immunized statements could be used to prepare witnesses where the government only had agreed not to "offer in evidence in its case-in-chief . . . any statements made by the defendant"); United States v. Liranzo, 944 F.2d 73, 76-77 (2d Cir. 1991) (stating that the proffer agreement, which only barred the government's use of the defendant's "statements" as evidence at trial, allowed the government to use the defendant's immunized identification of himself as the "Frank" named in the original indictment to refresh the informant's memory of "Frank's" identity and then to file the superseding indictment with "Frank" correctly identified); cf. United States v. Rutkowski, 814 F.2d 594, 599 (11th Cir. 1987) (holding that Fed. R. Crim. P. 11(e)(6)(D) only excludes evidence of "statements" made in course of plea discussions and "makes no reference to anything other than evidence of 'statements' as being excludable").

[7] In contrast to proffer agreements that bar only the use of "statements," those agreements that prohibit the government's use of "information" are broad in scope. In United States v. Carpenter, 611 F. Supp. 768, 771 (N.D. Ga. 1985), the court analyzed, inter alia, an unwritten agreement that "any information furnished by the defendant 'would not be used against him.'" Id. at 775. The court held that any ambiguity "should be resolved in favor of the criminal defendant," id. at 776 (quoting Rowe v. Griffin, 676 F.2d 524, 526 n.4 (11th Cir. 1982)), and thus the court rejected the government's argument that the defendant was only protected "against direct use of his statements," id. at 775. See also United States v. Pelullo, 917 F. Supp. 1065, 1071 (D.N.J. 1995) (holding that immunity letter stating that no "information" provided by defendant may be used against him in any criminal case was "expressed in the broadest possible terms" and provided full use and derivative use immunity).

4

construction will not be given to one part of a contract which will annul or obliterate another part."); <u>Fortec Constructors v. United States</u>, 760 F.2d 1288, 1292 (Fed. Cir. 1985) (describing "well accepted and basic principle that an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless").[8]

The majority's interpretation would render useless the protection given by Paragraph 3 to "information" provided by Varona. Whenever the government decides to use "information" (as opposed to "statements") provided by a defendant against that defendant at trial, the government must take steps to procure the relevant evidence and present it at trial. According to the majority's reasoning, these steps <u>always</u> render the procured evidence merely "derivative evidence" from "investigative leads," permissible under Paragraph 4 of the agreement. The majority's interpretation thus effectively deletes the term "information" from Paragraph 3.

Read together properly, Paragraphs 3 and 4 are consistent. The two provisions <u>barred</u> the government from using Varona's information to inculpate her by the most direct means possible, but they <u>allowed</u> the use of Varona's information to obtain "derivative evidence" from "investigative leads." This interpretation, unlike

---

[8] Indeed, the very contract cases cited by the majority conclude that "[a]n interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions meaningless." <u>Guaranty Financial Services, Inc. v. Ryan</u>, 928 F.2d 994, 999-1000 (11th Cir. 1991) (quoting <u>United States v. Johnson Controls, Inc.</u>, 713 F.2d 1541, 1555 (Fed. Cir. 1983)).

the majority's, satisfies the majority's own requirement that "no term of a contract should be construed to be in conflict with another unless no other reasonable construction is possible." Guaranty Financial Services, Inc. v. Ryan, 928 F.2d at 1000 (quoting United States v. Johnson Controls, Inc. 713 F.2d at 1555). Furthermore, only this interpretation of the contract preserves the independent meaning of the term "information" in Paragraph 3. See 17A Am. Jur. 2d Contracts § 387; Fortec Constructors, 760 F.2d at 1292; Guaranty Financial Services, 928 F.2d at 999-1000; Johnson Controls, 713 F.2d at 1555.

An example illustrates the difference between this interpretation and that of the majority. Assume that Varona, pursuant to this proffer agreement, told the authorities about the location of hidden cocaine in her home. Under the majority's reasoning, the proffer agreement would allow the government to use Varona's information to obtain a warrant, seize the cocaine, and introduce it as evidence against Varona at trial. The majority presumably would consider the cocaine to be evidence "two steps removed in the derivative chain from Varona's statements and information" and therefore permitted by the "controlling" language of Paragraph 4.

Properly interpreted, however, the proffer agreement clearly would bar such a government strategy. In order to preserve the meaning of the term "information" in Paragraph 3, the agreement at a minimum must prohibit the government from using Varona's information to inculpate her in the most direct way possible. The

6

agreement thus must prohibit the government from proving Varona's possession of cocaine by simply introducing the very cocaine that Varona herself told the government how to locate. This direct proof of Varona's possession would constitute the use of Varona's "information" against her, prohibited by Paragraph 3, not the use of "derivative evidence" obtained from "investigative leads," allowed by Paragraph 4. I believe that this interpretation of the proffer agreement, unlike the majority's, appropriately reflects the entire agreement and ensures that the term "information" in Paragraph 3 retains independent meaning.

Having determined the plain meaning of the proffer agreement, I conclude that the government violated the agreement in this case. Just as the government in the example above would have used Varona's information to prove her possession of cocaine in the most direct way possible, here the government used Varona's information to prove her distribution of cocaine in the most direct way possible. Namely, the government used Varona's description of her delivery of cocaine in order to obtain the recipient's testimony about the same delivery. Apart from using Varona's own statement against her at trial (a strategy barred by Paragraph 3's protection of Varona's "statements"), the government has no more direct way of proving Varona's distribution of cocaine. If Paragraph 3's protection of Varona's "information" is to retain independent meaning, then the agreement must be read to bar the government's actions in this case.

Contrary to the majority's assertion, this interpretation of

7

the proffer agreement is consistent with the plain meaning of Paragraph 4.  Even though the agreement prohibited the government from using Varona's information to demonstrate her culpability by the most direct means possible, the government nonetheless had ample authority to use "derivative evidence" obtained from "investigative leads."  For example, the government could have relied on Varona's implication of Hechavarria to interview Hechavarria's neighbors.  Then, consistent with the proffer agreement, one of the neighbors possibly could have testified at Varona's trial that he frequently had seen Varona enter Hechavarria's house with packages and leave without them and that he had been visiting Hechavarria when Varona arrived with a package containing white powder.  Unlike the use of Hechavarria's testimony about the very transaction described by Varona, the use of the neighbor's testimony would not constitute the direct use of Varona's information against her, and it therefore would be permitted under Paragraph 4 of the agreement.[9]

---

[9] My analysis, of course, does not extend to several circumstances not before this court.  First, I do not suggest that the proffer agreement would have prohibited the government's behavior if Paragraph 3 merely had barred the government from using "statements" of the defendant against her in its case-in-chief and if Paragraph 4 had allowed the government to use all "information" provided by the defendant against her.

Second, I do not that Varona could have used her immunized statement to bar Hechavarria's trial testimony if he was going to testify against her even absent her statement.  Cf. United States v. Wiley, 997 F.2d 378, 381-82 (8th Cir.) (holding that the witness's testimony did not violate the proffer agreement in which the government had agreed that any information provided by the defendant would not be used to formulate additional criminal charges against him; noting that the witness already had given information about the defendant before the defendant was even

8

II.

Because in my view the government violated Varona's proffer agreement when it introduced Hechavarria's trial testimony against her, I turn to the question of whether the government had a legitimate and wholly independent source for Hechavarria's trial testimony.[10] The grand jury named Hechavarria in the superseding

arrested or questioned), cert. denied, 510 U.S. 1011, 114 S. Ct. 600 (1993); United States v. Blau, 961 F. Supp. 626, 631 (S.D.N.Y. 1997) (holding that the witness's testimony did not violate statutory use and derivative use immunity, see 18 U.S.C. § 6002, where the defendant's proffer implicating the witness did not influence witness's decision to plead guilty and inculpate defendant).

Third, I do not suggest that the proffer agreement would have barred Hechavarria's trial testimony if he had testified not about the same transaction described in Varona's statement, but instead about other narcotics trafficking in which Varona may have been engaged. Cf. United States v. Catano, 65 F.3d 219, 226 (1st Cir. 1995) (holding that the district court properly allowed the witness to testify that the defendant stored marijuana at witness's home, where the grant of immunity concerned only the "direct use of the [defendant's] testimony" and where the defendant had identified the witness to the government while exposing a fentanyl operation at the witness's home). I merely would hold that the proffer agreement barred the government from putting on Hechavarria's testimony about the very transaction described in Varona's immunized statement where the government indicted Hechavarria on the basis of that statement and secured a plea agreement in which Hechavarria agreed to testify at Varona's trial.

Finally, I would hold only that the government's orchestrated strategy of securing Hechavarria's indictment, having him plead guilty, and then introducing his testimony at Varona's trial constituted the use of Varona's information against her. I do not suggest that the proffer agreement would have barred Hechavarria's testimony if he had been tried together with Varona and if he had inculpated her while testifying in his own defense at trial. But cf. United States v. Byrd, 765 F.2d 1524, 1532 n.11 (11th Cir. 1985) ("We also strongly suggest that an immunized witness never be tried with those whom he has implicated.").

[10] The government bears the affirmative burden of establishing that its evidence was not tainted by a defendant's immunized statement; this is done "by establishing the existence of an independent, legitimate source for the disputed evidence." United

indictment based solely on the testimony of Agent Lucas, who related the contents of the immunized statements of Varona and Jose.[11] Absent Varona's immunized statement, the government had no independent means of securing Hechavarria's indictment and thus had no independent means of obtaining his testimony. As the government itself admits in its brief on appeal, "It was critical for the government to use Varona's statement against Hechavarria because without that statement there would not have been a basis for indicting him for possession."[12]   Moreover, Jose's debriefing statement, which also named Hechavarria, does not constitute an independent source for Hechavarria's indictment and subsequent testimony because Varona's prior debriefing statement may have shaped Jose's questioning.  See United States v. Schmigdall, 25 F.3d 1523, 1530-31 (11th Cir. 1994) (holding that the government

_____

States v. Schmigdall, 25 F.3d 1523, 1528 (11th Cir. 1994) (citing Kastigar, 406 U.S. at 460, 92 S. Ct. at 1665); United States v. Hampton, 775 F.2d 1479, 1485 (11th Cir. 1985) (citing United States v. Seiffert, 501 F.2d 974, 982 (5th Cir. 1974)).  To establish a "wholly independent" source for its evidence, see Schmigdall, 25 F.3d at 1528 (quoting Kastigar, 406 U.S. at 460, 92 S. Ct. at 1665), the government must demonstrate that each step of the investigative chain through which the evidence was obtained was untainted, see Schmigdall, 25 F.3d at 1528 (citing Hampton, 775 F.2d 1479 at 1489).

[11] See Gov. Ex. 52 at 2-7.

[12]  Br. of the U.S. at 19.  Cf. Hampton, 775 F.2d at 1488-89 (holding that government violated transactional immunity when it used testimony of immunized witness to build case against co-conspirator, who consequently struck a plea bargain with prosecutors and agreed to testify before grand jury against the immunized witness; stating that "government made absolutely no attempt to establish that the testimony of [the co-conspirator] was obtained independently of [the witness's] immunized testimony").

10

failed to carry burden of proving an independent source of immunized statements where such statements may have been used to shape the questioning of proffered alternative sources of information).

My analysis would be different if, prior to Varona's statement, Hechavarria had been indicted and had pleaded guilty. Under those circumstances, the government presumably would have had a legitimate and wholly independent source for its evidence, and Varona could not have used her debriefing statement to protect herself from Hechavarria's trial testimony. Here, however, the government obviously had no independent source for Hechavarria's trial testimony. I thus conclude that the district court erred in allowing Hechavarria to testify about the same transaction described in Varona's statement.

### III.

Having determined that the admission of Hechavarria's testimony was erroneous, I address the majority's contention that, even if Varona has demonstrated error, the error was not "plain error." Because Varona's counsel failed to object to Hechavarria's testimony at trial, Varona must demonstrate on appeal that: (1) the error was plain, clear, or obvious; and (2) the error affected substantial rights, in that it was prejudicial and not harmless. See United States v. Olano, 507 U.S. 725, 732-735, 113 S. Ct. 1770, 1777-78 (1993); United States v. Foree, 43 F.3d 1572, 1577-78 (11th

11

Cir. 1995); see also Fed. R. Crim. P. 52(b).[13]  I believe that Varona has met both of these requirements.

A.

The majority asserts that "when two of the three judges who address a matter conclude that there is no error at all, that must mean there is no plain error."  I respectfully disagree.  In my view, the majority's interpretation of Varona's proffer agreement impermissibly deems two of the agreement's provisions to be in conflict and renders meaningless the term "information" in Paragraph 3.  Because I do not agree with my esteemed colleagues' interpretation of the agreement, their conclusion does not convince me that the district court's error was any less obvious.[14]

Moreover, even if the majority's interpretation were a legitimate alternative to the one I posit, that would only indicate that the agreement's language was ambiguous.  The agreement's legal significance nonetheless would be clear: the agreement barred the government from acting as it did in this case.  Where the language of an immunity agreement is ambiguous, the agreement must be

---

[13] It "is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice."  Foree, 43 F.3d at 1578 (citing Olano, 507 U.S. at 734, 113 S. Ct. at 1778).

[14] Plain error review is appropriate in this case because the district court, at the time of Hechavarria's testimony, was aware of all of the relevant circumstances, including the language of Varona's proffer agreement, the contents of her debriefing statement, and the government's use of her statement to indict Hechavarria.  On March 13, 1995, several days before Hechavarria's testimony on March 16, Varona's counsel presented these matters to the court in connection with Varona's motion to dismiss the superseding indictment.  See R4: 192-205.

12

interpreted according to the defendant's reasonable understanding at the time she entered into it. See In re Arnett, 804 F.2d 1200, 1202-03 (11th Cir. 1986) (interpreting plea agreement according to defendant's reasonable understanding at time of plea); Rowe v. Griffin, 676 F.2d 524, 528 (11th Cir. 1982) (interpreting immunity agreements pursuant to principles applied to interpretation of plea agreements).[15] Indeed, any ambiguity in the promise of immunity must be resolved in favor of the defendant. Id. at 526 n.4. I find it obvious that Varona reasonably would have believed that the agreement barred the government from using her statement to obtain Hechavarria's testimony about the same transaction described in her statement. She reasonably would not have assumed that Paragraph 3's prohibition on using "information" that she provided against her was completely trumped by Paragraph 4, which allowed the indirect pursuit of "investigatory leads" and use of "derivative evidence."

According to the majority, the fact that Varona's counsel failed to object to Hechavarria's testimony demonstrated that the government did not plainly violate Varona's proffer agreement. Plain error, however, may occur even when the defense counsel fails

---

[15] Cf. United States v. $87,118.00 in U.S. Currency, 95 F.3d 511, 517 (7th Cir. 1996) (stating that, when interpreting proffer agreements, ordinary contract principles should be supplemented with concern that the bargaining process not violate the defendant's rights to fundamental fairness under the Due Process Clause) (citation omitted); United States v. Plummer, 941 F.2d 799, 804 (9th Cir. 1991) (stating that ambiguity in an immunity agreement with two contradictory, yet reasonable, interpretations should be "resolved against the one who drafted the language").

to object to the government's violation of an immunity agreement. See United States v. Fant, 974 F.2d 559, 564-65 (4th Cir. 1992) (vacating sentence and remanding where use of defendant's immunized statements for purposes of sentence enhancement constituted plain error); United States v. Brimberry, 744 F.2d 580, 587 (7th Cir. 1984) (remanding for evidentiary hearing where trial court committed plain error in failing to determine, sua sponte, whether government's prosecution violated the immunity provision of the defendant's plea agreement). The fact that Varona's counsel was present when she signed the proffer agreement does not render the district court's error any less plain. Cf. United States v. McQueen, 108 F.3d 64, 66 (4th Cir. 1997) (vacating sentence for plain error where government, without objection, violated terms of plea agreement during sentencing); United States v. Goldfaden, 959 F.2d 1324, 1327 (5th Cir. 1992) (same).[16]

B.

---

[16] Furthermore, Varona's counsel had almost no warning concerning the content of Hechavarria's testimony. Hechavarria signed his plea agreement with the government on March 15, 1995, the third day of the trial and only the day before he testified against Pielago and Varona. See Plea Agreement of Carlos Hechavarria, Gov. Ex. 42, at 5. At the end of the day on March 15, Varona's counsel told the court, "[F]rankly, I haven't the vaguest idea what this man [Hechavarria] is going to testify to." R5: 390. The government eventually delivered to Varona's counsel a one-page, handwritten note about the government's debriefing of Hechavarria, see R5: 391; R6: 437, and then, during the morning of March 16, the government put Hechavarria on the stand to testify against Pielago and Varona, see R6: 445. These circumstances do not excuse the defense counsel's failure to object to Hechavarria's testimony about Varona's delivery of cocaine. Nonetheless, the defense counsel's error hardly demonstrates that the government "was within its rights," as the majority suggests.

14

The final element of the plain error inquiry is whether Varona has met her burden of proving that the error was not harmless. See Olano, 507 U.S. at 734-35, 113 S. Ct. at 1777-78. Admitting Hechavarria's testimony against Varona was harmless error only if this court is "persuaded beyond a reasonable doubt that the jury would have reached the same verdict even without consideration of the tainted evidence." United States v. Nanni, 59 F.3d 1425, 1433 (2d Cir. 1995), cert. denied, -- U.S. --, 116 S. Ct. 576 (1995). I believe that Varona has proven beyond dispute that there is at least a reasonable doubt that the jury would not have convicted her absent Hechavarria's testimony.

To convict Varona of conspiracy to possess cocaine with intent to distribute it, the jury had to find beyond a reasonable doubt that: 1) a conspiracy existed; 2) the defendant knew of the essential elements of the conspiracy; and 3) the defendant voluntarily and knowingly participated in the conspiracy. United States v. Harris, 20 F.3d 445, 452 (11th Cir.), cert. denied, 513 U.S. 967, 115 S. Ct. 434 (1994). "At a minimum, the defendant must willfully associate himself in some way with the criminal venture and willfully participate in it as he would in something he wished to bring about." United States v. Newton, 44 F.3d 913, 922 (11th Cir. 1994), -- U.S. --, 116 S. Ct. 161 (1995). Moreover, the defendant must have "a deliberate, knowing, and specific intent to join the conspiracy." Harris, 20 F.3d at 452 (citation omitted).

A defendant's participation in a conspiracy "need not be proven by direct evidence. That [he] had a common purpose and plan

15

with the other conspirators may be inferred from a 'development and collocation of circumstances.'" United States v. Lyons, 53 F.3d 1198, 1201 (11th Cir.) (citation omitted), cert denied, -- U.S. --, 116 S. Ct. 262 (1995). Where the government's case is circumstantial, however, "reasonable inferences, and not mere speculation, must support the jury's verdict." United States v. Perez-Tosta, 36 F.3d 1552, 1557 (11th Cir. 1994), cert. denied, 515 U.S. 1145, 115 S. Ct. 2584 (1995). For example, mere speculation as to the interpretations of words used by the defendant is insufficient evidence to link the defendant to a conspiracy. See United States v. Young, 39 F.3d 1561, 1565-66 (11th Cir. 1994). Similarly, a defendant's association with conspirators and her knowledge of the conspirators' actions are not themselves sufficient proof of participation in a conspiracy. See United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997)(stating that repeated presence at scene of drug trafficking, though probative, is not by itself sufficient evidence to support a conspiracy conviction); Lyons, 53 F.3d at 1201 (holding that "[m]ere presence, guilty knowledge, even sympathetic observation have all been held by this court to fall short of the proof required to support" a conviction for "conspiracy to possess and distribute drugs"). This court repeatedly has relied upon these principles in reversing conspiracy convictions for insufficiency of evidence.[17]

_____

[17] See, e.g., United States v. Thomas, 8 F.3d 1552, 1556, 1558 (11th Cir. 1993) (holding that evidence that the defendant knew of

16

Even though the government introduced surveillance and wiretap evidence at trial, Hechavarria's testimony was the only evidence indicating Varona's knowing participation in a conspiracy to possess cocaine with intent to distribute it. Prior to her husband's arrest on the evening of November 6, 1993, only one telephone call involving Varona was intercepted; on October 20, 1993, Varona merely answered the phone and gave it to Jose.[18] The government witness monitoring Frank Novaton's phone on November 6 stated that he intercepted calls between the Varona phone and the Novaton phone concerning an eight kilogram cocaine transaction, but he specifically stated that none of those calls involved Varona.[19] Similarly, the government presented no inculpatory surveillance evidence gathered prior to Jose's arrest. Agent Lucas testified

_____

planned bank robbery did not prove that he participated in conspiracy); United States v. Villegas, 911 F.2d 623, 631 (11th Cir. 1990) (stating that the defendant's looking left and right in the vicinity of his brother's cocaine deal was insufficient to show participation in the conspiracy), cert. denied, 499 U.S. 977, 111 S. Ct. 1625 (1991); United States v. Hernandez, 896 F.2d 513, 519-20 (11th Cir.) (holding that the defendant's association with the co-defendant was insufficient to prove conspiracy or possession even though the defendant was in vehicle from which drugs were retrieved and was present when drugs were given to an undercover agent), cert. denied, 498 U.S. 858, 111 S. Ct. 159 (1990).

[18] R4: 31 (testimony of Detective Morejon). Another government witness testified that part of a telephone call intercepted on November 6, 1993, involved Hechavarria and Varona talking about "telemedia cable." R4: 128-29 (testimony of Detective Diaz). The witness specifically stated that he was not suggesting that the discussion of cable television was a coded conversation about cocaine. R4: 129. Varona's voice also was heard in the background during an intercepted phone call between Jose and Hechavarria on November 6, 1993. She apparently was shouting at her children. R4: 104-05 (testimony of Detective Marrero); Gov. Ex. 11B.

[19] R5: 318-21 (testimony of Sergeant Martinez).

only that Varona and two children arrived at the house in the evening of November 6 after Jose and Pielago had entered with the cocaine.[20]  He did not suggest that Varona participated in any way in obtaining the cocaine, nor did he testify that Varona assisted Jose and Pielago in readying the cocaine for transport.

Other evidence concerning Varona consisted of phone calls intercepted <u>after</u> Jose was arrested.  Viewed in the light most favorable to the government, these phone calls suggest only that Varona knew that Jose had cocaine with him when he left the Varona residence on the evening of November 6 and that she knew where he was going.  Such evidence, standing alone, failed to establish that Varona knowingly participated in a conspiracy.  <u>See</u> <u>Lyons</u>, 53 F.3d at 1201.  Notably, no evidence indicated that an extra kilogram of cocaine[21] remained in the Varona residence after Jose and Pielago left, much less that Varona <u>knew</u> about the kilogram or <u>gave</u> the kilogram to anyone.

Only by introducing Hechavarria's testimony about Varona's

---

[20] R4: 170 (testimony of Agent Lucas).  The evidence did not demonstrate that Varona actually met with Jose and Pielago, but rather only that she arrived at the house while they were there. R5: 246 (testimony of Agent Lucas).

[21] Absent Hechavarria's testimony, the trial evidence does not even demonstrate that an extra kilogram of cocaine existed.  The crucial government witness on this issue contradicted himself regarding whether Jose had obtained eight or nine kilograms of cocaine prior to his arrest with eight kilograms.  <u>Compare</u> R5: 318–21 (testimony of Sergeant Martinez) (stating that intercepted phone calls between the Varona phone and the Novaton phone on November 6 established that there was activity in relation to the delivery of <u>eight</u> kilograms of cocaine) <u>with</u> R5: 329 (testimony of Sergeant Martinez) (stating that he "knew from what was going on during the investigation" that Jose had picked up <u>nine</u> kilograms of cocaine).

delivery of cocaine did the government present sufficient evidence to convince a jury beyond a reasonable doubt that Varona knowingly participated in a conspiracy to possess cocaine with intent to distribute it. Hechavarria testified that Varona called him after her husband's arrest and asked him to go by her house; when he arrived, Varona gave him a gray tool box that contained a kilogram of cocaine.[22] Hechavarria's testimony was not refuted, nor was it effectively challenged on cross-examination.

Apart from Hechavarria's testimony about Varona's delivery of cocaine, the government did not even present a prima facie case of conspiracy against Varona. Under the plain error rule, Varona has met her burden of proving that there is at least a reasonable doubt that the jury would not have convicted her absent Hechavarria's testimony about the transaction. See Olano, 507 U.S. at 734-35, 113 S. Ct. at 1777-78; see also Nanni, 59 F.3d at 1433.[23]

IV.

_____

[22] R6: 456-57.

[23] Even with Hechavarria's testimony, the jury had a difficult time reaching a guilty verdict against Varona. After one day of deliberations, the jury reached a verdict regarding Pielago, but it advised the court that it was unable to reach a verdict as to Varona. The district judge then gave the jury a modified Allen charge. See Allen v. United States, 164 U.S. 492, 17 S. Ct. 154 (1896). Following an additional day of deliberations, the jury submitted a note announcing that it was hopelessly deadlocked as to Varona. Upon being summoned to announce its verdict as to Pielago, however, the jury found Varona guilty of conspiracy. Although this sequence of events does not reveal the precise nature of the jury's deliberations on the conspiracy charge, courts in other cases have reasoned that an error was less likely to have been harmless where an Allen charge was necessary. See, e.g., United States v. Shavers, 615 F.2d 266, 269 (5th Cir. 1980); Mason v. Scully, 16 F.3d 38, 45 (2d Cir. 1994).

19

Even in a case involving plain error, "the Courts of Appeals should correct such error[] only when [it] 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" United States v. Foree, 43 F.3d 1572, 1578 (11th Cir. 1995) (citing United States v. Olano, 507 U.S. 725, 736, 113 S. Ct. 1770, 1779 (1993) (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S. Ct. 391, 392 (1936))). I believe that the government's violation of Varona's proffer agreement is sufficiently troubling to merit correction on appeal.

First, strict enforcement of immunity agreements protects central values of the judicial system, namely defendants' right to due process and their right against self-incrimination. See United States v. Harvey, 869 F.2d 1439, 1444 (11th Cir. 1989) ("Due process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes."); Rowe v. Griffin, 676 F.2d 524, 528 (11th Cir. 1982) ("When such a promise [of immunity] induces a defendant to waive his fifth amendment rights by testifying at the trial of his confederates or to otherwise cooperate with the government to his detriment, due process requires that the prosecutor's promise be fulfilled."); United States v. Weiss, 599 F.2d 730, 737 (5th Cir. 1979) ("To protect the voluntariness of a waiver of fifth amendment rights, where a plea, confession, or admission is based on a promise of a plea bargain or immunity, the government must keep its promise."); cf. United States v. $87,118.00 in U.S. Currency, 95 F.3d 511, 517 (7th Cir. 1996) (stating that immunity provisions of proffer agreements must

be interpreted to ensure "that the bargaining process not violate the defendant's rights to fundamental fairness under the Due Process Clause") (quotation omitted). Second, allowing the government to violate immunity agreements without any consequence seriously undermines the public reputation of the fairness of the judicial system. Third, failure to enforce the terms of immunity agreements renders such agreements significantly less attractive to witnesses and thus weakens an important law enforcement tool.

As the majority notes, the plain error rule is a narrow exception to the contemporaneous objection rule. Nonetheless, plain error review must be available to remedy palpable injustice. The Supreme Court has explained that Fed. R. Crim. P. 52(b), the plain error rule,

> was intended to afford a means for the prompt redress of miscarriages of justice. . . . The Rule thus reflects a careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly addressed.

United States v. Frady, 456 U.S. 152, 163, 102 S. Ct. 1584, 1592 (1982). In my view, convicting Varona solely on the basis of evidence obtained in violation of her proffer agreement is just the sort of injustice for which plain error review is appropriate.

Moreover, I disagree with the majority's implication that reversal for plain error is limited to cases involving an intervening change in law or a violation of specific procedural rules, such as Fed. R. Crim. P. 11. In one of the very cases cited by the majority, this court reversed the defendant's conviction

21

solely on the grounds that certain testimony, to which the defense failed to object, was unduly prejudicial. See United States v. Sorondo, 845 F.2d 945 (11th Cir. 1988) (reversing conviction because admission of DEA agent's testimony about informant's record in assisting other successful prosecutions was plain error). Indeed, this court has ruled that a variety of different types of error are plain error requiring reversal.[24]  The prosecution's prejudicial violation of an immunity agreement can be reversible plain error, as well.  Cf. United States v. Fant, 974 F.2d 559, 564-65 (4th Cir. 1992) (vacating sentence and remanding where use of defendant's immunized statements for purposes of sentence enhancement constituted plain error); United States v. Brimberry, 744 F.2d 580, 587 (7th Cir. 1984) (remanding for evidentiary hearing where trial court committed plain error in failing to determine, sua sponte, whether government's prosecution violated the immunity provision of the defendant's plea agreement).

In light of the overwhelming importance of Hechavarria's

---

[24] See, e.g., United States v. Banks, 942 F.2d 1576, 1579-81 (11th Cir. 1991) (reversing for plain error where jury instruction was inadequate to permit jury to give proper consideration to proffered defense); United States v. Singleterry, 646 F.2d 1014, 1018-19 (5th Cir. Unit A June 1981) (reversing for plain error where prosecutor asked defendant whether he associated with convicted felons); United States v. Darland, 626 F.2d 1235, 1237-38 (5th Cir. 1980) (reversing for plain error where judge excluded evidence concerning defendant's reputation for honesty, integrity, and peacefulness); United States v. Thompson, 615 F.2d 329, 332-333 (5th Cir. 1980) (reversing for plain error where judge dismissed government witness and instructed jury to disregard her surprise adverse testimony);  United States v. Garza, 608 F.2d 659, 663-66 (5th Cir. 1979)(reversing for plain error where prosecutor vouched for government witnesses and stated that government had no interest in convicting the wrong person).

testimony to the government's case against Varona, I find the majority's invocation of the "sandbagging" threat to be unpersuasive. Varona's counsel had nothing whatsoever to gain by failing to object to Hechavarria's testimony at trial, but if he had objected and the objection had been sustained, the government's case against Varona almost certainly would have failed. This case, therefore, hardly is one in which a defense lawyer "intentionally decline[d] to object to a potentially unconstitutional trial procedure in order to inject reversible error into the proceeding." United States v. Joshi, 896 F.2d 1303, 1307 n.3 (11th Cir.), cert. denied, 498 U.S. 986, 111 S.Ct. 523 (1990).

In my view, the record unequivocally indicates that Hechavarria's testimony was obtained in violation of Varona's proffer agreement. The record also indicates that the government had no legitimate and wholly independent source for Hechavarria's testimony and that no reasonable jury could have convicted Varona absent his testimony. I therefore would reverse Varona's conviction and remand her case for a new trial.[25]

Accordingly, although I CONCUR with Parts IV.A and IV.C of the majority opinion, I respectfully DISSENT as to Part IV.B.

---

[25] Under these circumstances, I see no need for the district court to conduct either an evidentiary hearing pursuant to United States v. Kastigar, 406 U.S. 441, 92 S. Ct. 1653 (1972), or a harmless error inquiry. See United States v. Schmigdall, 25 F.3d 1523, 1531 n.10 (11th Cir. 1994) (reviewing cases involving use of immunized testimony and concluding that "[i]n every case ordering outright reversal, the opinion indicated that there was a clear use of immunized testimony and that further proceedings would be futile").

23